[No. S004568. Crim. Nos. 23349, 25196. May 27, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
DEMETRIE LADON MAYFIELD, Defendant and Appellant.

In re DEMETRIE LADON MAYFIELD on Habeas Corpus.

146

162

## Counsel

Sanford Jay Rosen and Andrea G. Asaro, under appointments by the Supreme Court, Barbara Y. Phillips, Stuart Buckley, Jody Lerner, Sallyanne Campbell, Allison M. Zieve, Rosen & Phillips and Rosen, Bien & Asaro for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Jay M. Bloom, Jesus Rodriguez, Frederick R. Millar, Jr., Dane R. Gillette, Herbert F. Wilkinson, Deborah Factor and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—Demetrie Ladon Mayfield awaits, at San Quentin Prison, execution of a judgment of death. A jury convicted him of two counts of first degree murder. (Pen. Code, §§ 187, 189.)[1] The jury found true the special circumstance alleged in each count: that defendant, in addition to one first degree murder, was convicted at trial of an additional murder in the first or second degree. (§ 190.2, subd. (a)(3).) At the conclusion of the penalty trial, the jury returned a verdict of death. The trial court denied defendant's motion to modify the verdict and entered judgment.

In the 24 hours following the killings, defendant was arrested for their commission. He confessed to them that day during an interrogation that was audiotaped. The next day he agreed to reenact the crimes. The reenactment was videotaped.

Defendant's taped description of the killings' circumstances left no possibility of dispute at trial that he had shot and killed both victims and murdered the second of them. The only questions were whether the murder of the second victim was in the first or second degree, and whether the killing of the initial victim was murder or involuntary manslaughter. The prosecution theorized that defendant had carried out two brutal executions. The defense contended that the first killing was an accident, hence involuntary manslaughter, and the second a rash impulse, hence second degree murder. The trial's guilt and penalty phases together took 10 days.

---

[1]Unlabeled section references are to this code.

FACTS

A. *Guilt Phase Facts.*

Early on the morning of February 3, 1983, police found the bodies of Ora Mae Pope and Edward Moreno[2] in a shed adjoining the Pope residence. Both had just died from gunshot wounds. Within hours of the discovery, police arrested defendant at his home. They also recovered a shotgun from the house of Patricia Harper, a friend of defendant.

Defendant, a young man, had known Ora Mae Pope for about two years; her son Byron was a friend of defendant. But there was evidence that defendant was angry at the Pope family. Defendant had been arrested for the theft of the Popes' 1968 Pontiac, and Byron Pope or his mother, or both, had decided to press charges against him. Defendant had been sentenced to a year in jail and was awaiting incarceration when he committed the killings.

The trial produced strong evidence that defendant had plotted the killing of Ora Mae Pope in order to exact revenge on one or both of the Popes, and that he had killed Edward Moreno because he witnessed Ms. Pope's killing.

There was evidence that before the crimes defendant told two witnesses he was going to kill Ora Mae Pope as revenge for the car-theft prosecution. The witnesses—defendant's friend Glen Brooks, and defendant's cousin Michael Taylor—denied having heard defendant say so. In turn, however, the prosecution introduced evidence of prior inconsistent statements (Evid. Code, § 1235) in the form of taped telephone conversations. In one, Taylor told a detective that on the day of the killings defendant said he was going to kill Ms. Pope because of the car-theft charges. In the other, Brooks told the detective that he was present at Taylor's house the day of the killings and had heard defendant say, "Man, I'm going to kill Home Boy's mother." In addition, Patricia Harper testified that defendant, just before the killings, had said something to the effect that Ms. Pope and Edward Moreno were "going to get theirs."[3]

Patricia Harper's testimony established that the night of the killings defendant left her house and surreptitiously approached the nearby Pope residence. For a few minutes, apparently through the living room window, he spied and eavesdropped on Ora Mae Pope and Edward Moreno, who were

---

[2] The record sometimes refers to Moreno as John Moreno or Edward John Moreno. For simplicity we will refer to him as Edward Moreno throughout.

[3] The words are the prosecutor's. The witness agreed that she had heard defendant say something similar.

sitting on the living room couch. When defendant returned to Harper's house, he told her he was angry about what he had overheard.

As mentioned above, defendant gave a confession on February 3, 1983, which was audiotaped, and on February 4 he reenacted the killings and the events surrounding them on videotape. The tapes established that after the eavesdropping foray described in the previous paragraph, defendant obtained his 12-gauge shotgun, which he had previously sawed off, and went back to the Pope residence with two shells—all the ammunition he owned. With a screwdriver he removed the screen from a window in the Popes' bedroom and pried open the window. He crept through the bedroom into the living room, where he confronted Ora Mae Pope about the car-theft prosecution. Defendant aimed the loaded, cocked shotgun at her while the two discussed or argued about the car-theft charges. The gun discharged and killed her. Defendant then shot and killed Edward Moreno, seated on the same couch as Ms. Pope, because he was a witness to Ms. Pope's killing.

In his audiotaped confession, defendant gave two accounts of Ora Mae Pope's death. While they were arguing or discussing the car-theft charges, Ms. Pope leaned over to get a cigarette and defendant, with his finger on a hair trigger, accidentally discharged the gun; or she started to come at defendant from the couch and he shot her because he was scared or startled.

Defendant dragged the two victims—Ms. Pope still showing signs of life, but Edward Moreno dead—to an outside storage shed. In a futile attempt to erase evidence of the shootings, he hosed blood off the pavement between the house and the shed, locked the house, and restored the rear window to its original condition. He took the shotgun to Patricia Harper's house, telling her he had shot the victims. "He said he did it," she testified. "It slipped. He didn't mean to. And then he had to. . . . He had to do the second one." She also testified that defendant showed her the two spent shotgun shells, and that she permitted him to conceal the weapon on the premises. Defendant then told Harper, in her words, that he was "going to go wait for Byron, too" and to "get Byron, too."

There was evidence that, carrying a towel-wrapped kitchen knife he had obtained from the Pope residence, defendant returned thereto to lie in wait for Byron Pope behind a nearby parked van. Pope testified that defendant approached him from the van and confronted him, the towel containing the knife wrapped around his arm. The two wrestled and defendant succeeded in forcing Pope to leave without entering the house. Defendant essentially

confirmed this account in his taped statements.[4] After warding off Pope, defendant went home. Later that morning the police found him there.

Defendant waived opening statement, did not testify, and did not present any witnesses. His defense consisted of the playing of the complete audio-taped confession—the prosecution had played only excerpts—and closing argument.

At closing argument defendant's counsel contended that the first killing was an accident and that the second was second degree murder. He asserted that it was implausible defendant would have calculatedly lied to the police when he described the killing of Ora Mae Pope as an accident, but then forthrightly admitted he killed Edward Moreno to silence a witness. Defendant did not know the meaning of special circumstances or death eligibility; as far as he knew, when he was confessing to the police he was confessing to murder. In defendant's mind, he threw himself completely on their mercy—in counsel's words, he "put his neck in the noose . . . ."

Therefore, counsel argued, the jury should accept that the first killing was an accident. The defense acknowledged the existence of evidence of premeditation of that killing, but maintained that defendant had abandoned any intent to kill before his shotgun accidentally discharged.

With regard to the killing of Edward Moreno, the defense conceded it was murder, either of the first or second degree, but contended that it was the latter because defendant had not had sufficient time to deliberate and form the specific intent to kill. Defendant argued that if the jury agreed that Moreno's death was murder but could not find it to be first degree murder beyond a reasonable doubt, it was legally bound to convict him of second degree murder.

The prosecution emphasized its theory that neither version of defendant's story that Ora Mae Pope's killing was accidental was true: defendant had killed Ms. Pope purely for revenge. The prosecution also argued that the evidence showed the killing of Edward Moreno was deliberated and premeditated. In answer to defendant's claim that the shotgun had a hair trigger, at closing argument the prosecution invited the jury—which had access to the gun as a trial exhibit—to squeeze the trigger.

---

[4]The evidence regarding this event was susceptible of two interpretations: that defendant meant to do Pope harm, or that he wanted to ward him off from entering his mother's house and seeing the evidence of carnage that the living room now contained, and armed himself with a knife because neither he nor Pope trusted the other. Defendant was not charged with any crime against Pope.

B. *Penalty Phase Facts.*

The prosecution introduced evidence of criminal activity involving the use or attempted use of force or violence (§ 190.3). There was evidence that on October 9, 1982, defendant, angry at a former girlfriend who had broken up with him that day, fired a rifle round through her family's living room window after saying to her, in effect, "If I can't have you, can't nobody have you." There was also evidence that defendant had once or twice before threatened her by displaying to or pointing at her a gun, which may or may not have been functional. Another former girlfriend testified that on Halloween of 1982 defendant became angry with her and hit her in the face with his fist.

Defendant's sole penalty phase witness, Dr. Craig Rath, a clinical psychologist, illuminated defendant's background and character for the jury and offered other evidence in mitigation. Dr. Rath testified that defendant had "indicated considerable remorse [over the killings] in different ways at different times in [an] interview." Defendant was moderately to severely depressed in jail, perhaps because of his actions; not all killers are. And Dr. Rath was "personally stunned at the degree of rapport" that defendant had with at least five different jail guards—"they seemed to like him and he seemed to like them. [¶] In addition to that, he appears to be in many ways a socialized person. He does respond to authority in many ways, follows rules more than he breaks them, and he would be, of the inmates I have seen, he would be among the easier to handle."

Through Dr. Rath's testimony the defense introduced the evaluation of Dr. Guy Hunt, a neurologist, that "the crime of which he is accused is out of character and can be explained only on the basis of definite cerebral impairment due to alcohol and drug abuse." According to Dr. Rath, the killings were the culmination of a deterioration in defendant's personality that had been occurring for some 18 months. Dr. Rath described rather briefly defendant's family structure and background, his relationship with the girlfriend into whose house defendant had allegedly fired, defendant's history of drug abuse and the possible cognitive effects thereof, defendant's work background, and defendant's "long history" of health problems, including poorly controlled juvenile onset diabetes mellitus. Dr. Rath stated that defendant's friend Patricia Harper did not believe at first that defendant had killed, because in her view "it seemed out of character for him" (the psychologist's words). Dr. Rath told the jury that defendant had an inadequate education and was "[i]n many ways" "dull" and basically "in the low average range of intelligence" as a result of an emotionally deprived childhood.

Finally, counsel asked Dr. Rath to say whether he thought the crimes were out of character for defendant. Dr. Rath replied, "The jury has already decided what happened in their own minds, and I'm not going to tell them any different. The only thing I would point out to them is that in my opinion what occurred is qualitatively different than most of defendant's behavior for most of his life. And one thing that seems to collaborate with it is extensive drug usage. What is commonly seen with that usage is deterioration in reasoning, judgment, and lack of insight, and so on. And what happened, whether it was exactly deliberate, as you have decided, or what, does seem to be out of character compared to almost all of his previous history." (Paragraphing omitted.)

In rebuttal, the prosecution called another psychologist, Dr. William H. Soltz, who had interviewed defendant once on each of the two days following the killings. Dr. Soltz concluded that defendant intended to kill and planned the crimes "very affirmatively." Dr. Soltz also stated on the basis of the interviews that defendant "had a plan [to get Ora Mae Pope to drop the charges]. He executed it in getting in the house. He had a gun to scare them, and it got out of hand and he shot them both. He killed her. He shot her, and once he shot her, he knew he had to shoot the other person." Dr. Soltz concluded that the killings were consistent with defendant's past reactions to bad situations.

Dr. Soltz also testified that defendant told him he had had only one can of beer the day of the killings and his mind was clear for all practical purposes. Defendant's behavioral problems had motivated his mother to have him tested as an adolescent, apparently at the Loma Linda University Medical Center; a few days after the killings defendant's mother told Dr. Soltz that defendant was "a very dangerous child," possibly because that was the evaluation Loma Linda had made of him. Defendant told Dr. Soltz that he was arrested at age 21 for attempted robbery, and mentioned his arrest for the theft of the Popes' automobile. (The jury was instructed not to consider that testimony as evidence that defendant did attempt the robbery or steal the car.)

Defendant impeached Dr. Soltz by eliciting concessions on cross-examination. He got Dr. Soltz to admit grudgingly that in another case in which the psychologist testified against a defendant represented by defendant's counsel, his mental evaluation was wrong. He could have administered other tests to defendant but chose not to do so. Defendant's lack of an outward showing of "acute" remorse did not mean he did not regret what he had done, and Dr. Soltz could not tell the jury that defendant was not "damn sorry"—counsel's words—for what he had done. Dr. Soltz did not have

access to many records that might have been helpful; the written material on which he relied consisted solely of police records.

DISCUSSION

## I. JURY SELECTION ISSUES

### A. *Inclusion of Jurors Philosophically Favoring Death.*

■ Defendant contends that the court erred in denying his challenges for cause of 13 prospective jurors who were biased in favor of the death penalty and who, in defendant's opinion, could not fairly weigh the factors that might be presented in mitigation. Defendant concedes, however, that he did not exhaust his peremptory challenges.

We have held that a defendant must exhaust the peremptory challenges available to him to remove prospective jurors who should have been excluded for cause in order to preserve the issue for appeal. (*People* v. *Raley* (1992) 2 Cal.4th 870, 904-905 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Defendant fails to offer any justification for his failure to exhaust his peremptory challenges, and did not indicate any dissatisfaction with the jury when sworn. Thus any claim of error is procedurally barred. (*Ibid.*)

### B. *Exclusion of Jurors Expressing Doubts About the Death Penalty.*

■ Next, defendant contends the court erred in excluding jurors who expressed doubts about the propriety of the death penalty. He calls our attention to the exclusion of two venirepersons.

Jurors must be excused if their views on capital punishment would prevent or substantially impair the performance of their duties in accordance with the instructions and their oath. (*People* v. *Danielson* (1992) 3 Cal.4th 691, 712-713 [13 Cal.Rptr.2d 1, 838 P.2d 729], quoting *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844].) Our review of the record reveals no error in the exclusion of the two venirepersons. Both declared that they could not vote for death under any circumstances and thus could not follow their oath. Hence they were properly excluded. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1261-1262 [270 Cal.Rptr. 451, 792 P.2d 251].)

### C. *Creation of Guilt-prone Jury by Exclusion of Jurors Opposed to Death.*

■ Finally, defendant contends the exclusion of jurors opposed to the death penalty created a jury improperly predisposed toward guilt. He acknowledges that we have held that those who would always vote against

death yet profess impartiality with regard to guilt do not constitute a cognizable class whose exclusion offends the federal or state Constitutions. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 956-957 [2 Cal.Rptr.2d 112, 820 P.2d 214].) We have not changed our view, and decline to revisit the question.

## II. GUILT PHASE ISSUES

### A. *Validity of Miranda Waiver.*

As stated above, the day of defendant's arrest the San Bernardino police interviewed him regarding the crimes. The interview was tape-recorded. Before giving his statement, the interviewing detective—possibly showing defendant the written text of the warning required by *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]— read the text to defendant. The text was written in the first person—e.g., "Anything I say can and will be used as evidence against me in court." Defendant then waived his *Miranda* rights, saying, as the written record reflects, "Yeah" and "Oh, I guess so" in response to questions about his willingness to waive them.

In addition, the detective, aware that defendant was a diabetic, asked defendant at the beginning of the audiotaped interview whether he felt physically capable of being questioned. Defendant responded that he felt up to the task. Because this issue will become important when we consider defendant's petition for writ of habeas corpus, we set forth defendant's colloquy with his interrogator on this topic:

Detective Anderson: ". . . My name is Dave Anderson. This is my partner, Steve Jarvis, and I need to talk to you about some few things.

"But first I need to see how you're doing.

"You were out to the hospital, right? Did you see a doctor out there?"

Mr. Mayfield: "Yeah."

Detective Anderson: "Did he give you like a prescription or something or some medication for your, for your stomach?"

Mr. Mayfield: "He didn't give me my medicine yet, so I don't know."

Detective Anderson: "Okay. How you feel? When was the last time you had your medicine?"

Mr. Mayfield: "It was yesterday. I didn't take it this morning. I'm supposed to take it every day."

Detective Anderson: "You're supposed to take it every day?"

Mr. Mayfield: "But I didn't take it this morning."

Detective Anderson: "When was the last time you had it?"

Mr. Mayfield: "Yesterday."

Detective Anderson: "About what time?"

Mr. Mayfield: "8:00 [a.m.]."

. . . . . . . . . . . . . . . . . . . . . . . .

Detective Anderson: "Okay. How are you feeling right now?"

Mr. Mayfield: "[Unintelligible.] That's all, no."

Detective Anderson: "Otherwise you're . . . ."

Mr. Mayfield: "Yeah."

Detective Anderson: "There's no problem with you talking to us and stuff? You feel up to that?"

Mr. Mayfield: "Yeah."

Before trial defendant sought a ruling on the tapes' admissibility. He questioned the *Miranda* waiver's validity, contending that the interviewing detective's failure to explain his *Miranda* rights in the second person before questioning began made the warnings confusing and therefore his waiver was not knowingly and intelligently given. Court and counsel listened to the audiotape, which contained the reading of the *Miranda* warnings. The court concluded that the use of "I" rather than "you" did not confuse defendant, and ruled that the tapes could be used as evidence notwithstanding the claim.

The court wondered, however, whether the videotape was such powerful evidence that the standard *Miranda* warning did not suffice to warn defendant of the tape's incriminating effect.

Defendant now contends the trial court erred in failing to suppress the audio and video versions of his confession and reenactment of the crimes

because the audiotape was made involuntarily and therefore was inadmissible, and because the videotape was inadmissible as the poisoned fruit of the audiotape. Three bases for the contention regarding the audiotape are offered on appeal: that the interviewers did not give defendant, a diabetic, insulin even though they knew he needed it; that they unlawfully induced or coerced him to make the incriminating statements; and that defendant's waiver was invalid because grudgingly given.

■ Defendant did not raise the medical ground at trial as a ground for excluding the audiotape and videotape as involuntary. Nor did he raise his present contentions that the audiotaped statement was involuntary because it was made as a result of an improper inducement (see *People* v. *McClary* (1977) 20 Cal.3d 218, 228-229 [142 Cal.Rptr. 163, 571 P.2d 620]) and that he never waived his *Miranda* rights *ab initio* because his response was grudging at best and therefore involuntary. Because he did not raise them at trial, his claims of involuntariness on those grounds are not preserved for appeal. (*People* v. *Kelly* (1992) 1 Cal.4th 495, 519 [3 Cal.Rptr.2d 677, 822 P.2d 385].)[5]

■ Defendant also renews his contention that the *Miranda* waiver was invalid because the detective's use of the first person rather than the second in reading defendant his rights was confusing. This claim is preserved for appeal. We find it meritless, however.

The interviewer told defendant, "I have to read you your *Miranda* warning rights. . . . [¶] I'm going to read them off of this waiver form here." Then, after reading from the sheet of paper, the interviewer said, "You're being charged with, with two counts of murder. Okay? [¶] With those rights in mind, do you want to talk to me . . . ?"

The trial court's determination that the *Miranda* waiver was valid raises a predominantly legal question subject to independent review on appeal. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84].) Under this standard and in light of the record quoted above, we do not conclude that the trial court erred. The use of the first person cannot have been confusing; it was obvious whose waiver was being sought. It is also plain that the interrogator's preliminary and follow-up questions provided an adequate context to make clear to defendant that it was his rights he was waiving. Thus we conclude defendant made a knowing and intelligent waiver of his *Miranda* rights.

---

[5]We nevertheless address issues of coercion and inducement in part II.C., *post*. And the issue of voluntariness on grounds of mental impairment is discussed in our treatment of defendant's petition for writ of habeas corpus, part IV.D., *post*.

■ As for whether the use of a videotaped reenactment requires a more elaborate warning of the possibly incriminating effect than the standard recitation of the rights to remain silent and to counsel, we have discovered no authority for the proposition that the law requires a more elaborate warning than the *Miranda* formula. The *Miranda* rule assures that defendants knowingly waive specific constitutional rights. The degree of prejudice to defendant arising from that waiver is not a question of constitutional magnitude and is not a necessary basis for a knowing and intelligent waiver.

■ Finally, defendant's contention that the videotape should have been suppressed as the poisonous fruit of the audiotape is not preserved for appeal, as he failed to raise that claim at trial. (*People* v. *Terry* (1970) 2 Cal.3d 362, 383 [85 Cal.Rptr. 409, 466 P.2d 961].) It obviously fails on the merits in any event, given our determination that the initial waiver was valid.

B. *Ability to Waive Counsel's Presence at Arraignment.*

On February 7, 1983, defendant was arraigned on charges of two counts of murder (§ 187). No special circumstances were alleged in the complaint. Defendant waived his right to counsel at the arraignment. On February 22, 12 days after counsel for defendant was appointed, the complaint was amended to charge a special circumstance of multiple murder. Defendant waived his right to formal rearraignment.

■ ■ Defendant suggests his unwaivable right to counsel at arraignment in a capital case (§ 987, subd. (b)) was violated because the prosecution withheld the special circumstance allegations from the original complaint so as to avoid the mandatory provision of counsel at the original arraignment. Citing *Hamilton* v. *Alabama* (1961) 368 U.S. 52, 54-55 [7 L.Ed.2d 114, 116-117, 82 S.Ct. 157], he also contends that the procedure violated the federal Constitution because it deprived him of counsel at a critical stage in the proceedings. If he had counsel, defendant maintains, he would have been able to consider pleading guilty to the two noncapital murder charges and thereby avoided his death sentence, and that he would have had an earlier opportunity to investigate a defense of lack of intent to kill because of intoxication or disease. We are not persuaded.

■ Defendant was not capitally charged when first arraigned; therefore subdivision (b) of section 987 did not apply. And defendant's suggestion that the prosecutor acted so as to leave him without the benefit of counsel is purely speculative.

Furthermore, it appears that defendant is claiming the pleadings should have conferred a sort of dual status on him, to his benefit in each case: that

as a noncapital defendant he could have pleaded directly to the charges, but as a potentially capital defendant his right to counsel was not waivable. Defendant cannot claim the benefits of such a dual status; as we have just stated, he was not capitally charged when first arraigned.

We emphasize that the prosecution should never manipulate the pleadings to deny a defendant an unwaivable right to counsel. But the record is devoid of evidence of any such manipulation. Nor do we perceive what would be gained by any such attempt. If the prosecution proposes to refuse to negotiate a plea bargain it can do so whether or not a defendant is represented by counsel.

Defendant also claims that the harm resulting from the failure to appoint counsel was particularly severe because after his arraignment he was taken to another court and, without counsel, pleaded guilty to a battery against a former girlfriend. But the judgment of conviction itself was never used against him in this case. (See pt. III.F., *post*.) Therefore, no harm would have occurred even if error had.

■ Nor do we find merit in defendant's constitutional argument. *Hamilton* v. *Alabama*, *supra*, 368 U.S. 52, is distinguishable: The petitioner there claimed he was denied counsel at arraignment, not that he should not have been permitted to waive counsel. Defendant makes no claim that his waiver was in any way involuntary, so no constitutional error appears.

### C. *Ineffective Assistance of Counsel.*

Defendant contends that he was denied effective assistance of counsel at the guilt phase and thus was deprived of a right under the Sixth Amendment to the United States Constitution and a similar right under article I, section 15, of the California Constitution. The record, to which we are limited in considering defendant's direct appeal (see *People* v. *Diaz* (1992) 3 Cal.4th 495, 557-558 [11 Cal.Rptr.2d 353, 834 P.2d 1171]), shows otherwise.

Defendant contends that counsel was deficient in the following particulars:

1. He failed to invest the time necessary and the money available to prepare an adequate defense, and some of the specific inadequacies appear on the face of the record.

2. He failed to challenge the voluntariness of the audio- and videotapings of defendant's confession to and reenactment of the killings.

3. He told the jury that his client was guilty of the first or second degree murder of Edward Moreno, and thereby abandoned his client.

4. He failed to interview Patricia Harper, Michael Taylor, or Glen Brooks, all prosecution witnesses who had ties to and were sympathetic to defendant.

5. His playing of the entire audiotape of defendant's confession was extraordinarily damaging to his client.

6. He failed to ask for an instruction on voluntary manslaughter.

7. He failed to raise the issue of temporary insanity.

8. He failed to present an adequate closing argument.

9. He failed to object to the prosecutor's contention, at closing argument, that defendant had expressed no remorse over the killings, and to a statement that the jury could consider the manslaughter charge only if there was no evidence of murder.

 To establish a claim of ineffective assistance under either the federal or state Constitutions, a defendant must show (1) deficient performance under an objective standard of professional reasonableness and (2) prejudice under a test of reasonable probability. (*Strickland* v. *Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People* v. *Ledesma* (1987) 43 Cal.3d 171 [233 Cal.Rptr. 404, 729 P.2d 839].) Defendant fails to do so.

 We turn first to the claim of ineffective assistance of counsel for failure to challenge adequately the admission of the audiotape and videotape. We will not address the question of deficient performance, for, as we explain, we discern no reasonable probability that the result would have varied had counsel raised the claim that the confessions were involuntary.

We agree with defendant that the playing of the audiotape and videotape gave the prosecution very strong evidence of guilt. Moreover, they tended to negate any claim that defendant was under the influence of drugs or affected by his diabetes at the time of the crimes.

Nevertheless, defendant bears the burden of showing a reasonable probability that but for the asserted errors of counsel, the result would have been different. (*People* v. *Ledesma, supra,* 43 Cal.3d at pp. 217-218.) We conclude that there is no reasonable probability that the court would have

granted a motion to suppress the taped evidence on grounds of involuntariness had counsel made such a motion. The record on appeal strongly suggests that defendant was in possession of his faculties when the authorities recorded him on audiotape and videotape. His manner was rational, he assured the interrogator that he was well enough to proceed, and he showed no symptoms of confusion or illness. (See also pt. IV.D., *post.*)

■ Nor does the bare record, including our own review of the audiotape and videotape, yield any clue that the authorities coerced a grudging *Miranda* waiver from defendant (see pt. II.A., *ante*), or obtained the evidence by an improper inducement. With regard to the first point, we do not perceive that physical coercion was being applied to defendant when he made his statements. Nor was the confession rendered involuntary as a matter of law because the police threatened to quit listening to defendant. The police were entitled to do so. Their remark, about a course of action they could legally follow, was not sufficiently coercive to make the subsequent statement involuntary. (See *U.S.* v. *Pelton* (4th Cir. 1987) 835 F.2d 1067, 1072-1073.) With regard to the second, there was no inducement that might have made defendant's statement involuntary as a matter of law: the police did not offer defendant anything. (See *People* v. *McClary, supra,* 20 Cal.3d 218, 228; cf. *id.* at p. 229.) We therefore reject defendant's claims of ineffective assistance of counsel on direct appeal to the extent they dwell on counsel's alleged failure to challenge the voluntariness of the statements contained in the tapes the jury heard or saw.

Nor do defendant's other claims establish ineffective assistance of counsel on the face of the appellate record.

■ We cannot agree that counsel performed deficiently in failing to try to interview Patricia Harper, Michael Taylor, or Glen Brooks, in failing diligently to secure funds and spend time to develop the defense, or in playing the audiotaped confession. The record does not illuminate the basis for the challenged acts or omissions, and therefore " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." (*People* v. *Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) Neither premise of the foregoing rule was met; we therefore reject the claims. The same reasoning applies to the alleged failure to raise a defense of temporary insanity or to seek a voluntary manslaughter instruction; we therefore reject those claims as well.

■ We turn to defendant's contentions that counsel's closing argument amounted to the abandonment of his client because he conceded that Edward

Moreno's death was murder, and that counsel was ineffective for failing to object to the prosecution's contention at closing argument that defendant had expressed no remorse over the killings.

Our review of the record does not persuade us that the closing argument amounted to an abandonment of defendant. To the extent defendant is arguing that it is necessarily incompetence for an attorney to concede his or her client's guilt of murder, the law is otherwise. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 292-293 [168 Cal.Rptr. 603, 618 P.2d 149].) The record does not show that counsel ignored any express wish on defendant's part to present an active defense with regard to that count. (Cf. *People* v. *Burton* (1989) 48 Cal.3d 843, 856-857 [258 Cal.Rptr. 184, 771 P.2d 1270].) To the extent defendant is arguing it was an incompetent tactical choice, we disagree. It was not unreasonable to seek to avoid the death penalty by seeking a conviction on one count of second degree murder and one count of involuntary manslaughter on a plausible theory, when the prosecution's evidence put defendant at grave risk of two first degree murder convictions. As we have said before, candor may be the most effective tool available to counsel. (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1060-1061 [5 Cal.Rptr.2d 230 [824 P.2d 1277] [counsel conceded that whoever shot one particular victim had the intent to kill]; *People* v. *Wright* (1990) 52 Cal.3d 367, 415 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 292-293.)

Nor do we conclude that as a general matter closing argument was ineffective. It bears reemphasizing that the evidence against defendant was highly incriminating. Counsel attempted at length to convince the jury that at least the killing of Ora Mae Pope was an accident. He labored to persuade that Edward Moreno's murder stemmed from a rash impulse rather than a calculated decision. Counsel "attempt[ed] to make the best of a bad situation," given his very limited options. (*People* v. *McPeters* (1992) 2 Cal.4th 1148, 1187 [9 Cal.Rptr.2d 834, 832 P.2d 146]; see also *People* v. *Thomas* (1992) 2 Cal.4th 489, 531-532 [7 Cal.Rptr.2d 199, 828 P.2d 1011].)

Finally, we treat defendant's ninth claim—that counsel was ineffective for failing to object to certain aspects of the prosecutor's closing argument—immediately below. As will appear, we are unpersuaded that prejudice could have resulted from any error; therefore, counsel was not legally ineffective.

D. *Claims of Prosecutorial Misconduct.*

 Defendant contends that the prosecutor twice committed misconduct at closing argument. First, defendant argues that it was improper for the prosecutor to assert that no remorse was shown. Second, defendant maintains it was misconduct to imply to the jury that a conviction of involuntary

manslaughter for Ora Mae Pope's death was only possible if it could not return a verdict for second degree murder.

We are not required to address such contentions on the merits because, as defendant acknowledges, the issue has been waived: counsel did not object to the prosecutor's remarks and it appears that an admonition would have cured any potential harm. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) ▮▮ Nevertheless, we will do so in response to defendant's claim that the failure to assign misconduct constituted ineffective assistance of counsel. (*People* v. *Wharton* (1991) 53 Cal.3d 522, 567 [280 Cal.Rptr. 631, 809 P.2d 290].)

▮ It will be recalled that a mainstay of the defense was a theory that defendant killed Ora Mae Pope by accident. The prosecutor reminded the jury of defendant's contention, and urged its rejection. The prosecutor argued that the evidence pointed away from any suggestion of an accident, including defendant's own words as heard and seen on the tapes. In so doing, the prosecutor asked, "How about remorse? Has the defendant expressed remorse for this accident? What does he do after he kills Mrs. Pope that he says is an accident?" The prosecutor then interpreted defendant's behavior on returning to Patricia Harper's house after the killings. "And what are his last words to Pat Harper as he leaves the house? Is it, 'My God, what have I done? What am I going to do?' No. His last words . . . were, 'Now I'm going to get Byron, too.' [¶] There wasn't any remorse. . . ."

Defendant contends that the prosecutor's words were a constitutionally impermissible comment on his failure to testify at trial. (*Griffin* v. *California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229].) Not so. We review the comment to determine whether there is a reasonable likelihood that the jury would be misled about the inference to be drawn from defendant's silence. (*People* v. *Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) No such conclusion is possible. The remarks, viewed in context, cannot be seen as other than a fair comment on the state of the evidence that falls outside the purview of *Griffin* (*People* v. *Mincey* (1992) 2 Cal.4th 408, 446 [6 Cal.Rptr.2d 822, 827 P.2d 388]). If defendant's shooting of Ora Mae Pope was an accident, then why, the prosecutor wondered rhetorically, did defendant behave as the evidence suggested he did after the event?

The issue is very similar to that presented in *People* v. *Breaux* (1991) 1 Cal.4th 281 [3 Cal.Rptr.2d 81, 821 P.2d 585]. There too, albeit at the penalty phase, the prosecutor commented on the defendant's lack of remorse, saying he had not expressed any such sentiment after he killed. (*Id.* at p. 312.) We

held that the prosecutor's comment "was simply a reference to defendant's callous behavior after the killing." (*Id.* at p. 313.) In *Breaux*, of course, the prosecutor's comment was addressed to the defendant's character; here it was addressed to the type of homicide defendant committed. But the difference is insignificant. We note, too, that the jury was instructed prophylactically not to consider defendant's failure to testify.

■■■ The prosecutor also told the jury that if he failed to prove the elements of murder, then it could still convict defendant of the lesser included crime of involuntary manslaughter. "But . . . we only get to that point if there is no evidence or no proof of first or second degree murder. If there is, then it's the greater crime."

The comment, and similar comments the prosecutor made immediately after, were incorrect. Obviously, if the prosecution did not provide proof *beyond a reasonable doubt* that defendant had committed murder, the jury was required to acquit him thereof. (§ 1097.) But the court, after informing the jury that "we come to that part of the trial where you are instructed on the applicable law" and that "You must accept and follow the rules of law as I state them to you," instructed the jury that if it was not satisfied beyond a reasonable doubt that defendant had committed murder, it could then turn to the lesser included offense of involuntary manslaughter to determine whether the evidence sufficed to establish his guilt of that crime beyond a reasonable doubt. (See *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1236-1237 [14 Cal.Rptr.2d 702, 842 P.2d 1].) The court's instructions, not the prosecution's argument, are determinative, for "We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People* v. *Clair, supra,* 2 Cal.4th at p. 663, fn. 8.) Given the instructions provided here, we discern no reasonable likelihood (*id.* at p. 663) that the prosecutor's statements would have misled the jury; therefore defendant fails to demonstrate any prejudice arising from the failure to object.

E. *Claims of Carlos and Another Intent-related Error.*

■■■ Defendant contends the jury was not properly instructed that a special circumstance finding requires a finding of intent to kill as required by *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*). We reject the claim. Defendant admitted in the videotaped interview that he was solely responsible for the victims' injuries. "As we held in *People* v. *Anderson* [(1987)] 43 Cal.3d [1104,] 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], 'The court must instruct on intent to kill as an element of the . . . special circumstance when there is evidence from which

the jury could find [citation] that the defendant was an aider and abetter rather than the actual killer.' Here, all the evidence showed that defendant . . . actually killed [his victims] . . . ; there was no evidence that he was an aider and abetter. Accordingly, the court did not err in failing to instruct on intent." (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 142-143 [249 Cal.Rptr. 320, 756 P.2d 1348], fn. omitted.) *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] applies retroactively to murders committed before the decision in *Carlos*. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 840 [281 Cal.Rptr. 90, 809 P.2d 865].) The murders occurred in February 1983; *Carlos* was filed December 12 of that year. Therefore defendant's claim lacks merit.

██ Defendant also contends that the court confused the jury to his detriment by giving an instruction that implied specific intent was required to prove murder of either the first or second degree. The court stated, "The crime of murder requires the specific intent to kill unlawfully." The instruction, in defendant's view, encouraged the jury to believe that what defendant calls his reckless act sufficed to establish an intent to kill and thereby removed the issue of intent from the jury's consideration. We do not agree with defendant's contention, for we believe that the instruction could only have benefitted defendant. In our view the only reasonably likely interpretation the jury could have made of it (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 663) is that murder of either the first or second degree requires the specific intent to kill. Thus any error would have been harmless. (See *People* v. *Visciotti* (1992) 2 Cal.4th 1, 57, fn. 26 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

F. *Failure to Caution Jury on Role of Note-taking.*

██ Defendant contends the court erred in failing to caution the jury to pay attention to the trial and not become overly absorbed in note-taking. (See *People* v. *Whitt* (1984) 36 Cal.3d 724, 746-748 [205 Cal.Rptr. 810 [685 P.2d 1161].) We note that although the trial court invited the jurors to take notes, it reminded them simultaneously that they should "keep in mind what you hear during the presentation of the evidence." Even if this brief comment did not suffice to warn the jurors that they should not let their note-taking distract them from the task of judging defendant, we have explained since *Whitt* that the trial court is not required to give such an instruction. (*People* v. *Marquez* (1992) 1 Cal.4th 553, 578 [3 Cal.Rptr.2d 710, 822 P.2d 418].)

III. PENALTY PHASE ISSUES

A. *Importing Guilt Phase Instructions and Improper Argument.*

During the guilt phase the court instructed the jury that it should not be influenced by pity for defendant or prejudice against him, nor should it be

swayed by mere sentiment or sympathy. The court also instructed the jury to reach a just verdict regardless of the consequences. At the penalty phase, the court told the jurors they could consider guilt phase instructions if they found them to be applicable.

1. *Jury's Entitlement to Consider Sympathy.*

 Defendant contends that the jury was improperly instructed, via the guilt phase instruction, that it could not consider sympathy for him in weighing his fate—an error that violated state law and his Fifth, Sixth, Eighth and Fourteenth Amendment rights. He maintains that the error was compounded by the prosecutor's statement during closing argument that "as the judge indicated to you earlier in the original instructions that he gave you, any decision that you make [in] this case must be based on a conscientious and objective consideration of both the facts and the law, and you should not make your decision based on any sympathies or passions or prejudices or emotions, either for the defendant or against him."

We do not find it reasonably likely (*People* v. *Clair, supra,* 2 Cal.4th 629, 663) that the jurors were misled about the scope of their discretion in determining penalty. We thus reject the contention. We have reasoned that a jury will understand such an instruction does not foreclose compassionate evaluation of the mitigating evidence, but warns only against untethered emotion, bias, or outside pressure. (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1225 [275 Cal.Rptr. 729, 800 P.2d 1159].)

The facts are similar to those we confronted in *People* v. *Malone* (1988) 47 Cal.3d 1 [252 Cal.Rptr. 525, 762 P.2d 1249]. Malone's jury also was told at the guilt phase not to consider sympathy in reaching a verdict, and then was told at the penalty phase to consider guilt phase instructions it found relevant. We held that, given the penalty trial's focus on the defendant's background and character, the jury would not have misunderstood that it could not consider sympathy in deciding punishment. (*Id.* at pp. 39-42.)

We so conclude in this case. Sympathy was obviously at issue during the penalty trial. The court instructed the jury that it could consider (1) whether the offenses were committed while defendant was under the influence of extreme mental or emotional disturbance, (2) whether the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law's requirements was impaired by mental disease or defect or by intoxication, and (3) any other circumstances that might extenuate the crimes' gravity, even though they might not be legal excuses for the crimes. Indeed, in an abundance of caution the court instructed the jurors, in a

significant and appropriate modification of former CALJIC No. 8.84.2 (4th ed. 1979 bound vol.), that "If you conclude that the aggravating circumstances outweigh the mitigating circumstance [*sic*], you *may* impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you *shall* impose a sentence of confinement in the state prison for life without the possibility of parole." (Italics added.) The instructions as a whole adequately signaled the jury that it could consider sympathy, a signal buttressed by the use of "may" in the modified instruction quoted immediately above—a device that further emphasized to the jurors the normative nature of the decision they were to make.

To be sure, in *People* v. *Malone, supra,* the prosecutor stated that the jury could consider sympathy (47 Cal.3d at p. 41); here the prosecutor incorrectly stated the opposite. The prosecutor's comment, viewed in isolation, misstated the law and we cannot endorse it. We have held that each juror may assign whatever sympathetic value he or she will to each relevant factor, including those in mitigation. (*People* v. *Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) But we have already explained that we presume the jury understands the court's instructions to be statements of the law by a judge, and the prosecution's argument to be an advocate's attempt to persuade. (Pt. II.D., *ante.*) Moreover, the nature of the penalty trial itself vitiated the comment's effect, for, as we have stated, the defense at the penalty phase was designed to elicit sympathy for defendant in light of his background and medical history.

In fact the prosecutor's argument, taken as a whole, did not urge the jury to disregard sympathy. He reviewed the relevant statutory aggravating and mitigating factors seriatim. He argued that the circumstances of the crime should be considered in aggravation, as should be defendant's relevant prior criminal activity. He argued there was no extreme mental or emotional disturbance, but did not say the absence thereof was a factor in aggravation. He conceded that the absence of prior felony convictions and defendant's age were basically factors in mitigation, though the latter was not unequivocally so. He said that defendant's ability to appreciate the nature of his conduct and conform to the law's requirements might have been impaired by mental difficulties—though the prosecutor disagreed that the evidence led to any such conclusion. And he acknowledged the "evidence of extenuation" of the gravity of the crimes presented by Dr. Rath, evidence showing "possibly some extenuating circumstances," although he argued, to use his prefatory expression, that evidence of that factor "really is not present."

There was nothing inherently improper in the prosecutor's approach. (See *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 152-154 [2 Cal.Rptr.2d 335, 820

P.2d 559] (conc. opn. of Mosk, J.), vacated and remanded *sub nom. Baciga-lupo* v. *California* (1992) 506 U.S. __ [121 L.Ed.2d 5, 113 S.Ct. 32].) Moreover, each of the mitigating factors to which the prosecutor referred naturally touched on sympathy. And the prosecutor did not object when defense counsel stated at closing argument, "So you are not in a rigid situation. You don't have to count up these factors and you don't have to say, 'Well, I would like to give him life; I have the power to do that. But the law prevents me from doing it.' [¶] The law does not prevent you from doing it."

Given the record described above, we conclude that the proceedings did not mislead the jury about its role. We find no reasonable likelihood that the jurors understood they could not consider sympathy for defendant's background, in particular his medical difficulties.

### 2. *Instruction to Disregard the Consequences.*

A guilt phase instruction also told the jury to reach a just verdict regardless of the consequences. The instruction was not repeated at the penalty phase, nor should it have been. (See *People* v. *Malone, supra*, 47 Cal.3d at pp. 43-44.) ■■■ Defendant contends that the court's instruction at the penalty phase to consider relevant prior instructions undermined an asserted duty on the jury's part to consider the consequences of its action.

We see no reasonable likelihood (*People* v. *Clair, supra*, 2 Cal.4th 629, 663) that the jury would conclude it should disregard the consequences of its decision. The court instructed the jury to "consider[] the arguments of counsel" in reaching a penalty verdict. Both parties reminded the jury of the gravity of its role. The prosecutor stated, "Certainly we recognize that that kind of a decision is a very, very difficult decision for anybody to render. And obviously nothing I say or anyone says can make that decision any easier for you." Defendant's counsel argued, "We are talking about the life or death of a fellow human being . . . ." He reminded the jurors that "each of you, ladies and gentlemen, has the power of the gift of life in your hands . . . ." Moreover, the entire focus of the penalty trial was the consequence to defendant of his crimes. Given that focus, defendant's claim fails to persuade.

### 3. *Effect of Guilt Phase Instructions on Malice and Intent.*

■■■ Defendant contends that the giving of instructions at the guilt phase on malice and intent might have led the jury to believe it could not consider mental disturbance at the penalty phase. This contention is unpersuasive.

The jury was told at the penalty phase that it could consider in mitigation any extreme emotional or mental disturbances it found, and moreover was told to consider, if applicable, any other circumstance that might extenuate the crimes' gravity. Given the penalty defense's focus on defendant's medical and emotional problems, we are not persuaded there is any reasonable likelihood (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 663) that the jury would import these guilt phase instructions for the limiting purpose defendant suggests in light of the penalty phase instruction.

**B.** *Instructions' Restrictive Effect on Considering Mitigating Evidence.*

Defendant contends that certain instructions unconstitutionally restricted the jury's ability to consider mitigating evidence.

1. *Extenuation of the Crimes' Gravity.*

■ As described above, the jury was told it could consider any other circumstance that might extenuate the crimes' gravity, even though the circumstance would not provide a legal excuse for the crimes. Defendant contends the instruction unconstitutionally restricted the jury's consideration of sympathetic aspects of defendant's background and character. The United States Supreme Court has held otherwise, concluding that reasonable jurors would not understand the instruction to restrict consideration of sympathetic background evidence. (*Boyde* v. *California* (1990) 494 U.S. 370, 381-382 [108 L.Ed.2d 316, 329-330, 110 S.Ct. 1190].) Defendant argues that *Boyde* is distinguishable on its facts because, among other things, the prosecutor in that case acknowledged that the jury could consider defendant's character (*id.* at pp. 385-386 [108 L.Ed.2d at pp. 332-333]), whereas in this case the prosecutor told the jury to disregard sympathy. We have already explained that the prosecutor's comment was insignificant in the context of the other instructions and the penalty trial as a whole. (See pt. III.A.1., *ante.*) Hence we are unpersuaded that the distinction is material: even in light of the prosecution's comment there is no reasonable likelihood (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 663) that the jury misconstrued the instruction to preclude any consideration of sympathy for defendant.

2. *Extreme Mental or Emotional Disturbance.*

■ Defendant contends that by giving an instruction that the jury could consider in mitigation any extreme mental or emotional disturbance the court misled the jury that it could not consider such disturbances if of lesser degree. Defendant also notes that the court, after the trial had concluded, referred to the absence of any extreme disturbance in denying his motion to modify the verdict (§ 190.4, subd. (e)).

We disagree that the jury was misled by the instruction's wording. For reasons we gave in *People* v. *Benson* (1990) 52 Cal.3d 754, 803-804 [276 Cal.Rptr. 827, 802 P.2d 330], the instruction that the jury could consider any circumstance in addition to those specified that might extenuate the crimes' gravity leads us to conclude there is no reasonable likelihood (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 663) that the jury misunderstood the degree of disturbance, if any, it could consider. (See also *People* v. *Clark* (1992) 3 Cal.4th 41, 163 [10 Cal.Rptr.2d 554, 833 P.2d 561].) With regard to defendant's contention that the court's posttrial comment showed an undue focus on extreme disturbances, we note that the court also found no circumstances whatever that might have extenuated the crimes' gravity. We believe the court's comment shows that it saw no disturbance of a lesser degree that might have amounted to such an extenuation.

### 3. *Age As a Factor in Mitigation or Aggravation.*

Finally, defendant contends the jury should have been instructed that age could be considered only in mitigation, and that equivocal prosecution comments on the topic buttressed the instructional error, thereby making his penalty trial unconstitutionally unreliable. We have repeatedly rejected similar claims (e.g., *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1253 [9 Cal.Rptr.2d 628, 831 P.2d 1210]) and decline to alter our views. Moreover, the prosecutor conceded that age was a factor that could be considered in mitigation. (See pt. III.A.1., *ante*.)

### C. *Ineffective Assistance of Counsel at the Penalty Phase.*

Defendant contends that he was denied effective assistance of counsel at the penalty trial. He is not persuasive.

At the penalty phase as at the guilt trial, defendant bears the burden of showing ineffective assistance. He must show (1) deficient performance under an objective standard of professional reasonableness, and (2) prejudice under a test of reasonable probability. (*In re Marquez* (1992) 1 Cal.4th 584, 602-603 [3 Cal.Rptr.2d 727, 822 P.2d 435].) As we will explain here and in our discussion of the habeas corpus petition, counsel's effort to present a penalty defense was unimpressive. Nevertheless, we conclude it did not violate the state or federal constitutions.

### 1. *Quality of Closing Argument.*

Defendant contends that his counsel's closing argument (1) distanced counsel from his client by remarking on his status as appointed

counsel, (2) failed to mention factors in mitigation or stress the need for factors in aggravation to be proven beyond a reasonable doubt, and (3) in general was perfunctory. We do agree that it was perfunctory, but find no prejudice.

Counsel began his closing argument by stating, "We are talking about the life or death of a fellow human being and, for that reason, I may become emotional." He continued, "I thought about what I would say to you ladies and gentlemen and I read a quote from Justice Brennan of the United States Supreme Court. . . . [¶] He said, 'The role of the defense lawyer should be, above all, to function as the instrument and defender of the client's autonomy and dignity in all phases of the criminal process.' [¶] He said, 'The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client.' [¶] . . . 'It's this kind of service for which the Sixth Amendment makes provision and nowhere is this service deemed more honorable than in the case of an appointment to represent an accused too poor to hire a lawyer, even though the accused may be a member of an unpopular or hated group, or may be charged with an offense which is particularly abhorrent.' [¶] So, ladies and gentlemen, recalling those words of Justice Brennan, I want to tell you that I'm proud to stand before you and make no apologies for it whatsoever, both as a lawyer and as a man, to plead for the life of a fellow human being."

Counsel's curious reference to his appointed status appears to be of limited rhetorical value. Its point is obscure. But clear by contrast was counsel's summation of his mention of his appointed status: he was not just obligated but rather was proud to stand before the jury and plead for defendant's life. We do not believe counsel made his reference to his appointed status to distance himself from defendant. (See also *People* v. *Wade* (1988) 44 Cal.3d 975, 987-988 [244 Cal.Rptr. 905, 750 P.2d 794].)

If defendant is asserting that the defense's closing argument was inadequate in principle because briefly made, we cannot agree: brevity and eloquence are not necessarily inconsistent. (See pre-*Strickland* cases: *Kinnell* v. *State of Kan.* (D.Kan. 1981) 509 F.Supp. 1248, 1252, 1254 [seven-minute closing argument did not show incompetence of counsel; "[t]he closing argument . . . indicates preparation on the part of counsel and his development of the self-defense theory"]; *State* v. *Gutierrez* (1980) 1 Hawaii App. 268 [618 P.2d 315, 317] [court trial; decision to spend five minutes on closing argument was tactical and the record as a whole did not reveal ineffective assistance of counsel].) Contrary to defendant's claim, defense counsel did mention defendant's lack of prior felony convictions, the possibility that he was mentally impaired, and his age as factors in mitigation.

Counsel told the jury that defendant would die in prison no matter what penalty the jury prescribed—"The issue is how and when." He told the jury that if a single member decided the evidence in mitigation justified the lesser penalty of life imprisonment without possibility of parole, the law would sustain the verdict. Anticipating the jury's likely desire to punish defendant severely, counsel described the dreary life defendant was destined to spend behind bars if given the lesser penalty, and that defendant would forever have to contemplate the acts he had committed.

To be sure, counsel did not argue that factors in aggravation must be proven beyond a reasonable doubt, but such an argument would be mistaken except as regards evidence of unadjudicated crimes (*People* v. *Edwards* (1991) 54 Cal.3d 787, 842 [1 Cal.Rptr.2d 696, 819 P.2d 436]), a factor that in this case defendant contends to be and the court itself regarded as relatively minor. Moreover, it is evident that this point was adequately covered by the instructions to the jury: the jury was told that it must be satisfied that defendant committed the criminal activity beyond a reasonable doubt.

We leave aside any further discussion of deficiency, because the question of prejudice is not close. The crimes were egregious, and therefore the case in aggravation was strong. The jury had just heard Dr. Rath's mitigating evidence and must have had it well in mind. We discern no reasonable probability that had counsel delivered a stronger closing argument the outcome would have differed. (*In re Marquez, supra,* 1 Cal.4th at pp. 602-603.)

### 2. *Failure to Present Additional Mitigating Evidence.*

Defendant contends counsel was ineffective in failing to present additional mitigating evidence. The speculative character of this claim is illustrated by defendant's assertion that "Even if the testimony of doctors, relatives or friends might have been trivial in isolation, their cumulative effect [might] have altered the verdict in appellant's favor." Because the record does not illuminate the reasons for counsel's decisions with regard to the presentation of evidence, the claim is better raised in a petition for writ of habeas corpus, as defendant indeed did. (*People* v. *Wilson, supra,* 3 Cal.4th 926, 936; see pt. IV.E., *post.*) On direct appeal we reject it.

Defendant also maintains that counsel chose the sole defense witness, Dr. Rath, heedless of the risk involved. In defendant's view, Dr. Rath's testimony elicited extensive cross-examination that introduced damaging evidence of other instances of misconduct and a rebuttal case that included

evidence defendant had committed the crimes coldly, rationally, and without remorse. We discern no deficient performance in the introduction of Dr. Rath's testimony. As we have described above, Dr. Rath tried to portray defendant as a young man buffeted by the vicissitudes of a harsh life replete with physical, mental and environmental challenges—all proper items for the jury's consideration under section 190.3. On direct appeal we will not question counsel's choice to introduce such testimony—it was proper under an objective standard of effective counsel in light of the grim portrait of defendant the crimes themselves had painted at the guilt phase.

### 3. *Other Claims of Ineffective Assistance of Counsel.*

 Defendant asserts that counsel was ineffective in (1) failing to try to exclude the evidence of unadjudicated violent acts committed against defendant's former girlfriends; (2) failing to interview the former girlfriends; (3) failing to try to set aside defendant's subsequent plea of guilty to a charge of battery on one of the girlfriends; and (4) failing to object to the prosecution's use of hearsay evidence to prove defendant's prior violent conduct. These are tactical choices presented to us on a silent record; they are better evaluated by way of a petition for writ of habeas corpus, and on direct appeal we reject them. (*People* v. *Wilson, supra,* 3 Cal.4th at p. 936.)

 Finally, defendant contends we should find prejudice on the basis of ineffective assistance if "any substantial error" occurred because of the dire consequences of an adverse outcome at the penalty phase. We disagree. We have held that the standard of review of a claim of ineffective assistance is generally the same (see pt. III.C., *ante*) for either the guilt or penalty trials. (See also *People* v. *Mitcham, supra,* 1 Cal.4th 1027, 1080.)

### D. *Double-charging the Multiple-murder Special Circumstance.*

 Defendant argues that his sentence must be reversed because the state improperly alleged twice the special circumstance of having been convicted of multiple murder in the same proceeding. We do not normally review a charging decision unless there is a claim that invidious discrimination caused it. (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 971 [4 Cal.Rptr.2d 765, 824 P.2d 571].) No such claim is advanced here. We agree that one of the special circumstance findings must be set aside (*id.* at p. 955; *People* v. *Hardy* (1992) 2 Cal.4th 86, 191 [5 Cal.Rptr.2d 796, 825 P.2d 781]), but do not agree that the error requires reversal of the judgment. The jury could not have been confused about the number of victims, nor was it urged to engage in a mechanical counting of aggravating factors. (See *People* v. *Hernandez* (1988) 47 Cal.3d 315, 357 [253 Cal.Rptr.

199, 763 P.2d 1289].) Defendant insists, in supplemental briefing, that this error requires reversal of the judgment because the prosecution's penalty phase case was weak. We do not agree with the premise of that contention: the case in aggravation was not weak.

### E. *Quality of Evidence of Unadjudicated Violent Acts.*

At trial, the prosecution introduced evidence of defendant's unadjudicated violent acts against two former girlfriends. Defendant did not oppose the introduction of the evidence in the trial court. He now maintains on numerous grounds that his sentence must be reversed as a result of the introduction of the evidence.[6]

▇▇▇ Defendant concedes that he did not oppose the introduction of the evidence. His claim thus is procedurally barred. (*People* v. *Pinholster, supra,* 1 Cal.4th at p. 959.) ▇▇▇ We see little point in treating the issues on the merits notwithstanding defendant's claim, *ante,* part III.C.3., that his counsel's failure to oppose the introduction of the evidence amounted to ineffective assistance of counsel. (Cf. *People* v. *Wharton, supra,* 53 Cal.3d 522, 567.) We do not believe defendant's counsel would have succeeded in keeping from the jury the substance of the violent acts, even if he could have suppressed certain purportedly hearsay testimony regarding the incident involving the discharge of a firearm (see fn. 6, *ante*) as inadmissible under the Evidence Code. There is no doubt the introduction of evidence of defendant's conduct plainly showed "criminal activity . . . which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence . . . ." (§ 190.3.)

▇▇▇ Defendant also contends that the court's failure to instruct that the jury could not consider the unadjudicated prior criminal activity unless it *unanimously* found that the prosecutor had proved each element of the aggravating offense beyond a reasonable doubt violated the Fifth, Sixth, Eighth and Fourteenth Amendments and similar state constitutional provisions. We discern no such violation. In *People* v. *Gordon, supra,* 50 Cal.3d 1223, 1273, we determined that neither state law, nor "the cruel and unusual

---

[6]The grounds are: the alleged conduct was too "trivial" to be admissible under section 190.3; evidence of unadjudicated criminal acts cannot be introduced consistent with the Fifth, Sixth and Eighth Amendments and the latter's California equivalent; evidence that defendant fired a shot at a former girlfriend's house was inadmissible hearsay and also failed to establish the crime beyond a reasonable doubt; the prosecution failed to give notice that the girlfriend would testify that defendant had threatened her with a gun on prior occasions; the prosecution impermissibly asked defendant's expert witness about various possible instances of defendant's violent conduct; and the trial of this offense to a jury that had already convicted defendant of murder and the introduction of evidence of which he did not receive proper notice violated the Eighth Amendment.

punishments clause of the Eighth Amendment[, or] the due process clause of the Fourteenth Amendment" required such an instruction. In light of *Gordon,* we reject defendant's Fifth Amendment due process claim. The Sixth Amendment contention also fails to persuade; indeed, "we have never held that the United States Constitution requires such an instruction—neither, to our knowledge, has any other appellate court in a reported decision." (*People v. Benson, supra,* 52 Cal.3d 754, 811.) And "We reject the [state constitutional claims] at the threshold as not properly raised: defendant perfunctorily asserts the claim without argument in support." (*People v. Marshall* (1990) 50 Cal.3d 907, 945, fn. 9 [269 Cal.Rptr. 269, 790 P.2d 676].) Nor, contrary to defendant's urging, do we require that the jurors put in writing their findings regarding the alleged criminal acts. (*People v. Price* (1991) 1 Cal.4th 324, 490 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

### F. *Relitigation of Facts of Prior Violent Act.*

 Defendant contends that his conviction of battery required the exclusion of evidence of his battery of one of his former girlfriends. First, defendant concedes that he did not attempt to substitute the record of the conviction for the testimony given at trial. His claim is thus procedurally barred. (*People v. Pinholster, supra,* 1 Cal.4th at p. 960.) In any event, we have rejected similar contentions many times, and decline to reconsider the issue now. (*People v. Frank* (1990) 51 Cal.3d 718, 730 [274 Cal.Rptr. 372, 798 P.2d 1215].)[7]

### G. *Propriety of Prosecution Psychologist's Rebuttal Testimony.*

 Defendant argues that the rebuttal testimony of Dr. Soltz, the prosecution psychologist, was improperly admitted because it was the product of an involuntary confession. We have concluded, however, that the audiotaped statement and videotaped reenactment were not provided involuntarily. (See pt. II.C., *ante.*) The contention thus fails for want of a valid premise.

---

[7]We find unpersuasive defendant's argument that *Taylor v. United States* (1990) 495 U.S. 575 [109 L.Ed.2d 607, 110 S.Ct. 2143] requires a different result. In *Taylor* the court, considering what state-litigated offense of burglary might constitute a burglary enhancement under a federal law, held that the particular facts underlying the prior conviction should not be relitigated. (*Id.* at p. 600 [109 L.Ed.2d at p. 628].) The statutory scheme here at issue "involves wholly different considerations than ordinary criminal sentencing" schemes; it "properly allows the jury to focus on the defendant's prior criminal conduct and propensity for violence, factors deemed relevant as possible aggravating circumstances . . . ." (*People v. Danielson, supra,* 3 Cal.4th 691, 720.) Thus in our view, *Taylor* is distinguishable: the focus there was not on the defendant's background and character and certain past criminal conduct viewed as a whole, but merely on certain prior criminal convictions, the facts of which the federal high court implicitly held should not be retried because to do so would be inefficient. (495 U.S. at pp. 601-602 [109 L.Ed.2d at pp. 628-629].) (See also *People v. Johnson, supra,* 3 Cal.4th 1183, 1243, fn. 14.)

### H. *Propriety of Prosecution's Evidence Regarding Aggravating Factors.*

#### 1. *Propensity for Violence.*

Defendant contends that the prosecution, over his objection, introduced through Dr. Soltz's testimony character evidence that was inadmissible because it was general in nature and did not relate to any statutory aggravating factor.

The record reveals no objection on that ground. Rather, the prosecution's rebuttal witness, Dr. Soltz, stated that defendant had been arrested for attempted robbery. Defendant found this testimony "misleading" because the alleged crime was never offered as aggravating evidence in the prosecution's case-in-chief. In other words, the objection was to improper rebuttal testimony. Defendant moved for a mistrial and to strike the evidence; both motions were denied, but the court admonished the jury not to treat Dr. Soltz's statement as evidence that defendant had indeed attempted to commit a crime; rather, the jury could consider the statements only in evaluating the quality of the psychologist's opinion regarding defendant. The court's admonition was adequate.

#### 2. *Claim of Improper Rebuttal.*

Defendant also maintains that Dr. Soltz's testimony was improper rebuttal insofar as it reflected on defendant's character and his lack of remorse. We treat the first contention on the merits, for as we have explained, defendant raised it at trial.

Defendant's penalty phase witness, Dr. Rath, testified that the murders were out of character. The implication was that defendant, though troubled, was not as violent as the crimes would suggest. The prosecution was entitled to try to undermine defendant's claim of good character with expert testimony that the crimes were in character. (*People* v. *Mitcham, supra,* 1 Cal.4th 1027, 1071-1072; *People* v. *Fierro* (1991) 1 Cal.4th 173, 237 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

We understand defendant to claim that by eliciting Dr. Soltz's statement, the prosecutor unconstitutionally called attention to defendant's failure to testify at trial. (*Griffin* v. *California, supra,* 380 U.S. 609, 615 [14 L.Ed.2d 106, 110].) Defendant, however, did not object on any ground to Dr. Soltz's statement that defendant appeared to show no remorse, much less on the ground of *Griffin.* And we discern no reason to conclude that an objection and subsequent admonition by the court to the jury would not have

cured any harm. Therefore we will not consider on appeal defendant's contentions that the testimony was improper rebuttal under state law and amounted to a violation of due process of law. (*People* v. *Mincey, supra,* 2 Cal.4th 408, 446.)

### I. *Prosecutorial Conduct Regarding Defendant's Medical Test Results.*

 In his supplemental brief on direct appeal, defendant raises a new contention: that the prosecutor committed misconduct by implying throughout the trial that defendant's blood and urine had tested negative for the presence of phencyclidine (PCP), when in fact a lab test discovered after trial reveals that defendant's urine had not been tested for that drug. He maintains this court should consider the issue to avoid additional habeas corpus litigation. We decline to do so. Defendant does not contend he objected to any of the prosecutor's purported references. The claim is procedurally barred on direct appeal because it was not raised in the trial court. (*People* v. *Benson, supra,* 52 Cal.3d 754, 786, fn. 7.)

### J. *Reduction of Death Sentence to Life Imprisonment Without Parole.*

 Defendant contends that as a matter of law the mitigating circumstances outweigh the aggravating, and that we should therefore reduce his sentence to life imprisonment without the possibility of parole. We cannot agree. Defendant seemingly overlooks that the law permits the jury to consider in aggravation the circumstances of the crimes of which he was convicted at the guilt phase (§ 190.3, factor (a)): two first degree murders. We have already rejected defendant's premise that the prosecution's penalty case was weak. (Pt. III.D., *ante.*) Hence we must reject this claim too.

### K. *Constitutionality of 1978 Death Penalty Law.*

As have many other defendants, defendant contends the judgment of death must be reversed because the 1978 death penalty law is unconstitutional on six specific grounds. As we summarized them in another case, the grounds are that the 1978 law "fails: (i) to distinguish which penalty phase factors are aggravating and which are mitigating; (ii) to exclude 'non-statutory unspecified aggravating factors'; (iii) to require written findings of the existence of the aggravating factors supporting the death penalty; (iv) to require proof of each aggravating factor beyond a reasonable doubt; (v) to require jury unanimity on the dispositive aggravating factors; and (vi) to require proportionality review by the appellate courts." (*People* v. *Hardy, supra,* 2 Cal.4th 86, 214.) We have rejected claims made on the basis of those grounds. (*Ibid.*) Defendant also asserts that the 1978 death penalty is unconstitutional

for failure to require the jury to conclude beyond a reasonable doubt that death is the proper punishment. We have rejected this claim as well. (*People v. Roberts* (1992) 2 Cal.4th 271, 341 [826 P.2d 274, 6 Cal.Rptr.2d 276]; see also *People v. Clair, supra*, 2 Cal.4th 629, 691 [as a general matter at least, the 1978 death penalty law is facially valid under the federal and California constitutions].)

■ In supplemental briefing, defendant argues that section 190.3 is unconstitutional in light of *Stringer v. Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130]. He also contends the jury was unconstitutionally instructed in the language of section 190.3. He incorporates by reference the opening brief of Miguel Angel Bacigalupo on remand from the United States Supreme Court's decision to vacate and remand our previous decision in that case. (*Bacigalupo v. California, supra*, 506 U.S. __ [121 L.Ed.2d 5, 113 S.Ct. 32].)

Section 190.3 sets forth the criteria the trier of fact is to consider in deciding whether a death-eligible defendant shall live or die. In this case, the penalty jury was instructed on all the statutorily prescribed criteria. But the penalty trial focused on the three most relevant considerations: the circumstances of the crimes, prior criminal activity, and, in mitigation, considerations of background and character, including the possibility of emotional disturbance arising from drug use, diabetes, and a hard life.

In his letter brief and by his incorporation of the brief on remand in *People v. Bacigalupo, supra*, defendant contends in essence that, by its vagueness, section 190.3 and the instructions based on that section violate the Eighth Amendment's requirement of guided discretion in determining sentence in a capital case. He contends that the following criteria fail to satisfy the Eighth Amendment's requirements for what he terms a "rational and reliable capital sentencing": the circumstances of the crime; the presence or absence of prior relevant criminal activity; whether the crime was committed under circumstances of extreme mental or emotional disturbance; and his age at the time of the crimes. (See § 190.3, factors (a), (b), (d), (i).)

We disagree. In *People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118], we stated, with regard to factor (i) of section 190.3, "Finally, defendant cites *Stringer v. Black* (1992) 503 U.S. __, __-__ [117 L.Ed.2d 367, 377-383, 112 S.Ct. 1130, 1135-1140] in support of his contention that the age factor set forth in the standard penalty phase instructions is vague, thereby inviting arbitrary and capricious sentencing results in violation of the Eighth Amendment. Reversal on this ground is subject to a harmless error analysis. (*Id.*, at 503 U.S. pp. __, __ [117 L.Ed.2d at pp. 379,

382-383, 112 S.Ct. at pp. 1137, 1140].) Even assuming the age factor to be unconstitutionally infirm as contended, on the record before us we find no prejudice." (See also *People* v. *Proctor* (1992) 4 Cal.4th 499 [15 Cal Rptr.2d 340, 842 P.2d 1100]; *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 594-595 [15 Cal.Rptr.2d 382, 842 P.2d 1142] [discussing § 190.3, factors (a), (b), & (i)]; *People* v. *Noguera* (1992) 4 Cal.4th 599 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)

The same conclusion applies to the four sentencing criteria to which defendant objects. On this record, we do not believe that prejudice could have resulted from any error in relying on section 190.3 and reading the challenged instructions. Neither the argument nor the instructions could have focused the jury on any impermissible consideration under that section. The three most relevant considerations—the circumstances of the crimes, prior criminal activity, and, in mitigation, considerations of background and character—were set forth starkly for the jury's consideration. And as we have already stated, the prosecutor essentially conceded that age was a mitigating factor. (See pt. III.A.1., *ante*.) Defendant's supplemental letter brief points to no evidence, argument or instruction possibly giving rise to the consideration in aggravation of an impermissible matter.

■ Defendant also contends, in keeping with his previous contention, that we have interpreted the statutorily provided range of aggravating factors a juror may consider so broadly as to make the death penalty unconstitutional. He argues in essence that in decisions discussing death eligibility for murder committed while lying in wait, and reviewing the jury's discretion to consider age and victim-impact statements at the penalty phase, we have failed to adopt a narrowing construction of section 190.3, and therefore the statute does not guide the jury's discretion as he asserts is constitutionally required by, e.g., *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909].

We decline at this time to reconsider the previous majority decisions in the areas of lying in wait (*People* v. *Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244]) or victim-impact statements (*People* v. *Pinholster*, *supra*, 1 Cal.4th 865, 959). And not least because the prosecutor essentially conceded in this case that age was a mitigating factor (see pt. III.A.1., *ante*), we find unpersuasive defendant's contention that the jury was given unconstitutionally excessive leeway to consider age as a factor in aggravation.

L. *Motion to Modify the Penalty.*

■ Defendant asserts that the court erred under state law in denying his application to modify the death sentence by failing to independently

review the evidence to determine whether the jury's findings and verdict were contrary to the law and evidence, and by failing to state the reasons for its ruling. He also contends perfunctorily that the asserted error resulted in violations of the Fifth, Eighth, and Fourteenth Amendments, in essence because it deprived him of a full consideration of mitigating circumstances and a reliable sentencing determination.[8]

Under section 190.4, subdivision (e), a defendant sentenced to death is deemed to have automatically applied for a sentence modification. "In ruling on the application, the trial judge must independently reweigh the evidence of aggravating and mitigating circumstances and determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict. [Citation.] The judge must also state on the record the reasons for the ruling. [Citation.]" (*People* v. *Mincey, supra,* 2 Cal.4th 408, 477.)

The trial court reviewed the mandate of section 190.4, subdivision (e), and stated that it had reviewed and examined all the evidence. The court stated, "I don't take it as being the intent of [section 190.4, subdivision (e)] to give the Court the prerogative of exercising its own individual viewpoints regarding how the case should ultimately come out, but instead that section compels me to review what was presented to the jury and then to determine whether their finding was a mistake.

"In other words, I don't think I can act as that final arbitrator of the finder of fact in necessarily overruling what the other twelve members of that panel did absent some clear showing that their evaluation was wrong."

The preceding comments are somewhat enigmatic and difficult to interpret. More clearly wrong, however, were the court's additional comments that "I think the citizens of this state under our system, absent some overwhelming contrary consideration, have been given the choice or the responsibility, I should say, of choosing what penalty to impose. And I for one do not feel, absent some compelling legal or factual difficulty, to [*sic*] overturn that finding."

We do not know whether the missing material in the previous sentence is "be obliged," "be compelled," "be able," or some other phrase. But we agree with defendant that in making these comments the court misstated the applicable legal standard under section 190.4, subdivision (e).

---

[8]The court's ruling on the automatic motion to modify the death sentence generated additional litigation and two appeals. Because both parties have asked us to consider the effect of the original ruling and it appears to us that to do so is the proper action, we do not herein discuss the separate appeals. (See *People* v. *Mayfield, post,* p. 220 [19 Cal.Rptr.2d 877, 852 P.2d 372].)

The record of the hearing as a whole persuades us, however, that even though the court, in isolated instances, misstated the applicable standard, it nevertheless applied the proper concept. Not only did the court's prefatory comments indicate that it had the appropriate standard in mind, but it stated, in comments made before those just quoted, "The Court has and it does find that the evidence concerning the truth of those special circumstances as submitted to the jury, and that is that Mr. Mayfield in this case was convicted of two charges of murder, one of which was at least in the first degree, is conclusive[,] and the jury's assessment of the evidence that the circumstances in aggravation outweigh[] the circumstances in mitigation . . . is supported by the weight of the evidence and that their decision that the imposition of death is the appropriate verdict is not contrary to the law or evidence." The court concluded, "the Court's assessment is that the factors in aggravation beyond a reasonable doubt outweigh those in mitigation; that the finding of the jury was neither contrary to the law or evidence, and the automatic motion for modification by [*sic*] the jury verdict of death as to the Defendant is denied."

Thus, the court correctly applied the law (*People* v. *Mincey, supra,* 2 Cal.4th at p. 477), even if it did not correctly and consistently pronounce it. The court carefully reviewed the record and independently determined that the penalty verdict was not "contrary to law or the evidence presented." (§ 190.4, subd. (e).) There was no state law error.

Defendant's constitutional claims largely are asserted perfunctorily and without argument in support. Therefore we do not consider them. (*People* v. *Roberts, supra,* 2 Cal.4th 271, 340-341.) Defendant does, however, argue his claim that the court's action rendered his sentencing unconstitutionally arbitrary. He grounds his assertion on the belief that the trial court did not conduct an independent review of the evidence. We have, of course, just explained that we conclude otherwise.

M. *Proportionality Review.*

Defendant asks this court to compare his sentence to those imposed in analogous and "more serious" cases. We decline to do so. (*People* v. *Mincey, supra,* 2 Cal.4th at p. 476.) ▉ Defendant also contends the death penalty is "entirely inappropriate" because the uncontradicted facts of his case make it so. A claim that a penalty is disproportionate to a defendant's personal culpability is cognizable on appeal (*ibid.*), but we conclude there was no such incongruity. Defendant was convicted of two first degree murders and there was strong evidence that he killed Ora Mae Pope in a calculated manner for revenge and Edward Moreno to silence him as a

witness. Thus the sentence is not grossly disproportionate to defendant's personal culpability. (*Ibid.*)

### N. *Effect of Cumulative Errors.*

██ Defendant argues that the cumulative effect of the penalty phase errors was great enough to require reversal of the judgment. The only properly preserved claims of error we have found meritorious are the prosecutor's mistake in telling the jury to disregard sympathy, the jury's consideration of a duplicative special circumstance of multiple murder, and isolated misstatements of the law in discussing defendant's motion to modify the verdict. These flaws are insufficient to persuade us that, had they not occurred, there exists a reasonable possibility that defendant would have been sentenced to life imprisonment without possibility of parole.

## IV. THE PETITION FOR WRIT OF HABEAS CORPUS

### A. *Introduction.*

While his appeal was pending, Demetrie Ladon Mayfield filed a petition for writ of habeas corpus. We issued an order to show cause, appointed a referee, and directed the referee to take evidence and make findings of fact regarding petitioner's claim of ineffective assistance of counsel at the guilt and penalty trials.[9]

The referee's findings are summarized at length below. ██ ▬ ▬ In brief, the referee found that counsel failed to fully investigate a defense of

---

[9]Our order directed the referee to consider: "1. (a) What evidence, if any, was available to petitioner's trial counsel, S. Donald Ames, to show that petitioner's mental state—either at the time of the offenses with which he was charged or at the time of his post-arrest statements to the police—may have been affected by insulin-dependent diabetes, by the ingestion of phencyclidine or other psychoactive substances, or by any other similar factor? [¶] (b) What evidence, if any, of the kind referred to in the answer to subpart (a) of this [q]uestion, did petitioner's trial counsel fail to discover? [¶] (c) As to each item of evidence, if any, referred to in the answer to subpart (b) of this [q]uestion, why did petitioner's trial counsel fail to discover that item of evidence? [¶] (d) What evidence, if any, of the kind referred to in the answer to subpart (a) of this [q]uestion, did petitioner's trial counsel fail to introduce (i) to show that petitioner's post-arrest statements to the police were involuntary, (ii) to negate the existence of any mental state or intent that was an element of the offenses or allegations with which petitioner was charged, or (iii) to establish the existence of a mitigating factor at the penalty phase? [¶] (e) As to each item of evidence, if any, referred to in subpart (d) of this [q]uestion, why did petitioner's trial counsel fail to introduce that item of evidence?

"2. (a) Were there witnesses or potential witnesses for the prosecution whom petitioner's trial counsel should have discovered or interviewed, but did not? [¶] (b) If the answer to subpart (a) of this [q]uestion is affirmative, who were those persons? [¶] (c) As to each person, if any, named in the answer to subpart (b) of this [q]uestion, why should petitioner's trial counsel have discovered the identity of that person or have conducted an interview? [¶] (d) As to each person, if any, named in the answer to subpart (b) of this [q]uestion, why did

lack of intent by reason of intoxication or disease or to interview witnesses who in theory might have aided the defense at both the guilt and penalty trials.[10] The defense had limited funds for investigation; moreover, the referee concluded that counsel's pretrial preparation was scanty and that counsel failed to try to associate a second attorney who might have helped prepare and try the defense case.

After review of the record and consideration of the referee's report, we conclude that the petition must be denied.

The gravamen of petitioner's claim is that competent counsel would have further investigated and pursued solely or in part a mental state defense, based on petitioner's poorly controlled diabetes or his drug use on the night of the killings, or both. In petitioner's view, competent counsel would have used such a defense to try to persuade the jury that petitioner actually lacked the mental state for first degree murder, and, at the penalty trial, that petitioner's mental state should be considered in mitigation.

Petitioner raises two other significant claims. First, he maintains that before trial competent counsel would have pursued an exhaustive inquiry into his mental state at the time of his postarrest statements to try to persuade the court that they should be excluded as given involuntarily. Second, he

petitioner's trial counsel fail to discover the identity of that person or fail to conduct an interview?

"3. (a) Were there potential witnesses available to support the defense on the issue of guilt or penalty whom petitioner's trial counsel should have discovered or interviewed or called, but did not? [¶] (b) If the answer to subpart (a) [of] this [q]uestion is affirmative, who were those persons? [¶] (c) As to each person, if any, named in the answer to subpart (b) of this [q]uestion, why should petitioner's trial counsel have discovered the identity of that person or have conducted an interview or have called that person as a witness? [¶] (d) As to each person, if any, named in the answer to subpart (b) of this [q]uestion, why did petitioner's trial counsel fail to discover the identity of that person or fail to conduct an interview or fail to call that person as a witness?"

These were the only questions we found potentially meritorious. Hence we do not address other claims petitioner raised in his habeas corpus petition or in his briefs thereon.

[10]Petitioner and the referee sometimes refer to a defense of diminished capacity. That defense was abolished in California by statute as of January 1, 1982. (*People* v. *Mickey, supra,* 54 Cal.3d 612, 639, fn. 1; see §§ 25, subd. (a), 28, subd. (b).) Because defendant committed the crimes in 1983, the defense was unavailable to him for purposes of trial. (See *People* v. *Mickey, supra,* 54 Cal.3d at p. 639, fn. 1; cf. § 25, subd. (c) [court may consider evidence of diminished capacity when imposing sentence].) However, "Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).) Defendant was charged with the first degree murders of Ora Mae Pope and Edward Moreno; therefore he could still try to negate the aforementioned elements with evidence that he actually lacked the requisite mental state for first degree murder.

contends that competent counsel would have striven to obtain much more evidence of his good character and difficult upbringing and would have presented the same to the jury to further humanize him.

B. *Applicable Legal Standards on Review.*

■■■ "As we have explained in numerous cases following the United States Supreme Court's decision in *Strickland* v. *Washington*[, *supra*,] 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052]: 'There are two components to a claim by a defendant that his counsel's assistance was so defective as to require reversal of a conviction or death sentence. . . . "First, the defendant must show that counsel's performance was deficient." . . . This requires a showing that "counsel's representation fell below an objective standard of reasonableness." . . . In evaluating a defendant's [claim] of incompetence, we accord great deference to the tactical decisions of trial counsel. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." . . . [¶] The second component requires that the defendant show prejudice resulting from counsel's alleged deficiencies. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [¶] The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Jackson* (1992) 3 Cal.4th 578, 601 [11 Cal.Rptr.2d 531, 835 P.2d 371], quoting *In re Marquez, supra,* 1 Cal.4th 584, 602-603.) The defendant must make the showings of deficient performance and resulting prejudice by a preponderance of the evidence. (*People* v. *Mincey, supra,* 2 Cal.4th at p. 449.) The defendant need not, however, show that it is more likely than not that he or she would have obtained a better result. (*In re Wilson* (1992) 3 Cal.4th 945, 956 [13 Cal.Rptr.2d 269, 838 P.2d 1222].)

■■■ The referee's findings of fact are entitled to deference when, as we have generally concluded to be the case here, there is substantial evidence to support them. (*In re Jackson, supra,* 3 Cal.4th at p. 585.) This is so because the referee can observe the witnesses' demeanor, but this court cannot. (*Ibid.*) On questions of mixed law and fact or of a purely legal nature, however, we reach our conclusions on the basis of an independent review of the record and the law. (*Ibid.*) ■■■ Both any deficiency in counsel's performance and any prejudice occasioned thereby are mixed questions of law and fact. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 698 [80 L.Ed.2d 674, 700].)

C. *The Referee's and Our Own Findings.*

After considering the referee's report and reviewing the reference hearing transcript and the original trial proceedings, we deny the petition because we conclude that, whatever trial counsel's deficiencies, petitioner has not shown prejudice. We reach this conclusion with regard to both the guilt and penalty trials. ■ Our discussion is therefore somewhat truncated, for we need not give weight to deficiency when we conclude that there was no prejudice. (*In re Jackson, supra,* 3 Cal.4th at p. 604.) Nevertheless, we summarize at some length the referee's findings, embellishing them where we believe that a fuller statement of the record's contents is required.[11]

The referee found, among other things, that counsel failed to obtain various medical records, including records from the time of petitioner's arrest that would have revealed an elevated blood-sugar level of 387. Counsel did not consult an endocrinologist, a toxicologist, or a psychiatrist regarding the effect of diabetes or intoxicants on mental state.

As the referee found and the record reflects, an endocrinologist could have testified that when blood sugar exceeds 300, a diabetic may experience blurred vision, impaired reasoning, dehydration, headaches, and confused thinking, and might be clumsier than normal—a possible factor in a defense of accident. But the endocrinologist who testified at the reference hearing, Dr. Clinton Young, also testified that although an individual with petitioner's blood-sugar level might not feel well, he could still plan, premeditate, and form the intent to kill. Such a blood-sugar level would not have caused petitioner to do anything he would not otherwise have done.

A toxicologist could have testified that a chronic PCP user may store the substance in fatty tissue and it may later discharge, causing a psychotic reaction. Diabetes can enhance this effect.

A psychiatrist could have testified that petitioner suffered from mental disorders that might have affected the voluntariness of petitioner's *Miranda* waivers—indeed, the psychiatrist retained by petitioner's appellate counsel opined that petitioner's waiver was involuntary.

The defense did not interview some of petitioner's friends and relatives. Tommy Wydrmyr could possibly have told the defense that he saw petitioner

---

[11]Petitioner's briefing on the referee's report is extremely long and disputes much of it. Our own review, however, satisfies us that many of petitioner's exceptions are quibbles that collectively generate only a glancing blow. Where petitioner's exceptions are more significant, we discuss them individually.

use PCP at 6 p.m. February 1, 1983, about a day and a half before the shootings. But cross-examination suggested that Wydrmyr chose at the time of trial not to come forward to aid in the defense. There was thus evidence that he would not have been a particularly cooperative witness. Byron Pope could have told the defense he smelled alcohol on petitioner's breath the night of the shootings, but also could have testified that petitioner demonstated no sign of being under the influence of PCP, such as lack of coordination. Pope could also have testified that his mother could become agitated and irritable when drunk, waving her hands in the air or striking out.

Patricia Harper was interviewed by the defense investigator, but apparently he failed to learn from her that petitioner drank alcohol and smoked PCP the night of the killings. There was evidence, however, that she was reluctant after the killings to reveal information regarding petitioner's drug use.

Counsel's contact with his own client was superficial; counsel testified that his only significant interview with petitioner was at the courthouse on the morning of trial.

Counsel never retested, for PCP or alcohol, a sample of petitioner's blood, drawn shortly after the crimes' commission, which had tested negative for PCP. He made no effort to have a urine sample tested for PCP or alcohol and wrongly stipulated the urine sample had tested negative for PCP. Counsel had difficulty persuading the San Bernardino County trial court system to advance funds for his investigator and apparently, as we read the record, did not believe he could obtain more than the $1,000 he was granted.

Counsel failed to try to associate the assistant counsel to which petitioner was possibly entitled under *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]; thus, petitioner had only one lawyer to represent him rather than two. A second attorney could have devoted his or her entire time to defending the penalty case should petitioner be found death-eligible, or could at least do legal research or act as a foil for the primary attorney behind the scenes if the latter preferred not to distract the jury with another attorney's in-court presence. Counsel may not have anticipated that a penalty phase might occur, even though, as we conclude, the evidence of defendant's guilt was so strong that a penalty phase should have appeared all but inevitable. He put all of his energy into the guilt phase.

The referee, without questioning counsel's veracity, nevertheless doubted that counsel could have spent the 200 hours he claimed he devoted to preparing the defense case. Counsel may have spent time thinking about his

strategy. But his files contained no handwritten notes, no legal research, and no handwritten indications of out-of-court preparation. On the other hand, there was testimony that an attorney whose style is less focused on extremely methodical preparation can be effective before a jury.

The referee found that counsel "put all his energy into attempting to prove that the killing of Ora Pope was accidental. He apparently made the tactical decision not to confuse or prejudice the jury by introducing additional[,] diminished capacity [i.e., lack of intent] issues . . . ." But the referee had "no basis to conclude that such failure [to present a lack-of-intent defense at the guilt phase] was part of a strategy or plan."

It will be recalled that at the penalty phase the sole defense witness was a psychologist, Dr. Rath, who gave evidence of petitioner's background, medical difficulties, character, and remorse. Dr. Rath testified about the contents of a report a neurologist, Dr. Guy Hunt, had prepared. If summoned, Dr. Hunt could have testified that petitioner said he thought he was mentally impaired as a result of a combination of his diabetes and his having consumed a large amount of PCP and beer on the day of the killings. The neurologist could also have testified that the crimes were out of character for petitioner and could be explained only by mental impairment. The original record reminds us, however, that Dr. Rath did provide the jury with Dr. Hunt's opinion on that point at the penalty trial. Various friends and relatives of petitioner's could also have spoken on his behalf at the penalty phase. Counsel testified at the reference hearing that he chose to avoid such people because he believed the psychologist's professional demeanor would make him a more persuasive witness, and he could introduce some of the relatives' information about petitioner into evidence through the psychologist with less risk than the relatives might pose.

## D. *Effectiveness of Counsel at the Guilt Trial.*

The referee correctly decided that this court reserved for itself the determination whether counsel was ineffective. Nevertheless, in answer to our question 3(c) (see fn. 9, *ante*)—whether counsel should have discovered the identities of and/or called various potential witnesses—the referee stated with reference to the guilt trial, "While it is obvious that, in the best of all worlds, Mr. Ames should have undertaken a lot of investigation which he omitted to do, it is hard to fault his conclusion that the best defense of the guilt phase was based on [the] accidental shooting of Ora Pope, followed by an intentional shooting of [Edward] John Moreno. If he had succeeded in establishing the first shooting as manslaughter, there would never have been a penalty phase. ▆▆▆▆ Focusing for now just on the guilt phase,

all the discussion about endocrinologists and toxicologists makes sense *only* if one concludes it would have been advantageous to suppress petitioner's statements.[12] But looking at the case, as Mr. Ames saw it before the fact, it is not clear that it would have been helpful to petitioner to suppress the statements. The prosecution could easily have proven that petitioner inflicted the fatal shots. It easily could have proven, and at the trial the prosecution did prove through the testimony of Michael Taylor, petitioner's cousin, that on the day of the shootings, petitioner stated he was going to kill Ora Pope. The prosecution also proved through Glen Brooks that on the day of the shooting, petitioner told Brooks that he was going to kill Ora Pope. The best evidence, and the *only* evidence, Mr. Ames had of the first shooting being accidental, was petitioner's statements to the police, made, as Mr. Ames pointed out to the jury, shortly after the shooting and long before he had any opportunity to contact counsel. [See *ante*, p. 166.] [¶] . . . As to the guilt phase . . . this court has a difficult time concluding that such exploration [of a mental state defense] would have led to anything of value. Anyone who listens to the audio tape or views the video tape is struck with how composed and rational petitioner seems to be. Even considering all the testimony produced by petitioner's experts at the reference hearing, it is very difficult for this court to conclude that any judge would have suppressed the confessions or that any jury would have accepted a diminished capacity [i.e., a lack-of-intent] defense."

■■■■■ Petitioner objects to these statements, maintaining that they amount to recommendations and exceed the scope of our reference order. Whatever the technical merits of petitioner's claim (see *In re Cordero* (1988) 46 Cal.3d 161, 170, fn. 1 [249 Cal.Rptr. 342, 756 P.2d 1370]), our own review of the record of the trial and the evidentiary hearing confirms the sagacity of the referee's observations, and we independently reach the same conclusions. In particular, however deficient counsel may have been in failing to more fully explore a defense of lack of intent to kill or of lack of ability to waive his right to remain silent, we agree with the referee that it is very difficult to believe that such a defense would have been of use to petitioner. (Cf. *In re Sixto* (1989) 48 Cal.3d 1247 [259 Cal.Rptr. 491, 774 P.2d 164].)

---

[12]Petitioner objects to this and similar statements, contending that counsel could not make an informed decision regarding defense until he had investigated the possible merit of a mental state defense. It is true, of course, that a tactical decision must be an informed decision—a decision based on an inadequate investigation of possible meritorious defenses, based on facts known to counsel at the time, is not one deserving deference as a tactical choice. (See *People* v. *Ledesma, supra,* 43 Cal.3d 171, 215.) That is not to say, however, that every possible defense must be investigated, no matter how evidently fruitless the results would be. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland* v. *Washington, supra,* 466 U.S. 668, 690-691 [80 L.Ed.2d 674, 695].)

The question of mental state arises in two contexts: the voluntariness of petitioner's confession and reenactment, and the presentation of a lack-of-intent defense because of mental impairment at trial. We turn to the confession issue first.

 The law is clear that to have suppressed the statements, petitioner would have had to show that his reasoning was in fact so impaired that he was incapable of free or rational choice. (*In re Cameron, supra*, 68 Cal.2d 487, 498; see *People* v. *Hernandez* (1988) 204 Cal.App.3d 639, 648 [251 Cal.Rptr. 393]; see also *Colorado* v. *Connelly* (1986) 479 U.S. 157, 166-167 [93 L.Ed.2d 473, 483-484, 107 S.Ct. 515] [coercive police activity necessary predicate to finding of federal constitutional violation in obtaining confession; otherwise question of a defendant's state of mind is matter of state law].)

We do not believe petitioner could have made such a showing. As we described *ante*, part II.A., petitioner told his interrogator at the beginning of the audiotaped session that he felt up to the task of talking with him. Moreover, our own review of the tape confirms the referee's findings regarding the very dubious effect of a mental state defense.

Throughout the lengthy interview, including his comments immediately following the waiver, petitioner spoke clearly if somewhat slowly. At times he engaged in animated, jocular, prideful, indignant or defiant conversation with the interviewing detectives. Despite a relaxed quality to his speech, petitioner sounds lucid, much as he does on the videotape, by which time his medication evidently was not an issue, for petitioner does not contend he was deprived of insulin before the videotaping. Nor did petitioner ever inform his interviewers that he did not feel well, or ask them for medication. As far as the referee could or we can discern, defendant was not mentally impaired when he made his audiotaped statement. And the reference hearing produced scant evidence to the contrary. With one exception, at the reference hearing petitioner's panel of experts could only surmise—with varying degrees of confidence—that petitioner may have been under the influence of drugs or his diabetic condition so as to impair his capacity for judgment when he agreed to be taped.

The exception, Dr. Rita Hargrave, a psychiatrist, opined that "I do not believe that that was a voluntary waiver of [petitioner's] right to remain silent." She based that conclusion on an opinion that petitioner's speech was more slurred and slow on the audiotape than on the videotape, and on "the combined effect of him coming down off the PCP, plus the nature of his metabolic imbalance from his diabetes being out of control." But Dr. Hargrave was effectively impeached on cross-examination, agreeing she could

not be sure that either petitioner's diabetes or petitioner himself was out of control. We are unpersuaded that a court, hearing petitioner's remark that he felt capable of talking to his interrogator before his audiotaped confession, listening to petitioner's demeanor on that tape, and hearing expert testimony on the subject of voluntariness, would have suppressed the evidence. Therefore, we do not perceive that counsel's failure to pursue other avenues to suppress the statements was prejudicial. There is no reasonable probability that the proceeding's outcome would have differed.[13]

We turn next to the issue of petitioner's mental state at the time he committed the crimes. "Normally, merely showing that the defendant had consumed alcohol or used drugs before the offense, without any showing of their effect on him, is not enough to warrant an instruction on diminished capacity. [Citations.]" (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1241 [278 Cal.Rptr. 640, 805 P.2d 899] [considering the diminished capacity defense when the same was available under California law].) We see no reason for a different rule for a defense of lack of intent. The guilt phase evidence showed considerable evidence of the planning and premeditation of Ora Mae Pope's killing, and no witness at trial testified that petitioner was under the influence of either his diabetes or an intoxicating substance. At the reference hearing, as we have already stated, none of petitioner's expert witnesses could state unequivocally that his consumption of food, drugs or alcohol had altered his mental state in a definite or predictable manner. Therefore, we agree with the referee that it is very difficult to conclude that a jury would have accepted a defense of lack of intent by reason of disease or intoxication. On this point, too, petitioner has failed to show prejudice.

Two other items require discussion.

First, the most significant evidence in favor of an accident defense, other than petitioner's own taped confession, would have been if the shotgun used to kill Ora Mae Pope and Edward Moreno had a hair trigger or was otherwise defective. Petitioner urges that the reference hearing established that the shotgun was abnormal; therefore trial counsel was ineffective for failing to retain a criminalist to examine the gun. We are of a different view. Petitioner's expert conceded on cross-examination that there was nothing unusually dangerous about the shotgun. Indeed, our reading of the expert's testimony convinces us that if testimonal evidence similar to his had been introduced at trial it might have strengthened the case for premeditation and deliberation. The criminalist testified that when he "pulled the hammer to

---

[13]In light of this conclusion, we need not decide whether the adoption of article I, section 28, subdivision (d) of the California Constitution permits the introduction of the audiotaped statements.

full cocked position," the shotgun had a normal, even slightly heavy pull of seven pounds, but that if the gun were positioned "as if it ha[d] been fired," it would have a very light pull of two pounds. As the referee found, there was no evidence petitioner handled or fired the weapon in the latter fashion, and if he had done so "it might have shown *more* purposeful, intentional behavior, not *less*. (Italics by the referee.)

Second, petitioner raises a claim in supplemental briefing that counsel's loyalty to him was tainted by a desire not to jeopardize his standing with the San Bernardino courts by seeking proper funding for petitioner's defense. He emphasized this contention at oral argument.

To be sure, when " 'counsel is burdened by an actual conflict of interest, prejudice is presumed . . . .' " (*People* v. *Hardy, supra,* 2 Cal.4th 86, 135, quoting *Strickland* v. *Washington, supra,* 466 U.S. 668, 692 [80 L.Ed.2d 674, 696] .) A claim that counsel's loyalty was divided by virtue of his own conflicting interests is a claim of such a conflict. (*People* v. *Hardy, supra,* 2 Cal.4th at pp. 135-136.) " '. . . [T]he presumption arises, however, "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " ' " (*Id.* at p. 135, quoting *Strickland* v. *Washington, supra,* 466 U.S. 668, 692 [80 L.Ed.2d 674, 696].)

Our reading of the record leads us to conclude there is no merit to petitioner's claim, for there was no divided loyalty. Petitioner's counsel, S. Donald Ames, testified that it was difficult to obtain county funds for defense investigation at the time. For example, it required considerable effort for Ames to persuade a judge to grant funds to retain a neurologist at county expense, though the effort eventually succeeded. Ames conceded that in 1983 counsel could acquire a bad reputation, or "jacket," among the judges for asking for large amounts of funds for expert and attorney fees. But he stated, "I don't think that I made a conscious effort not to attain a jacket with the judges. If I did, so be it.[14] [¶] But I don't think that I either did or did not do any particular thing to avoid getting a jacket." Questioned further, Ames conceded he tried to avoid getting a reputation for asking for excessive attorney fees, but would not let that goal interfere with his representation of a client.

On this record we conclude that petitioner has not met his burden of proving ineffective assistance of counsel by a preponderance of the evidence (*People* v. *Mincey, supra,* 2 Cal.4th at p. 449), because he has not shown by

---

[14]We read this sentence to mean that if he got a "jacket" he was resigned to it, not that if he made a conscious effort to avoid a "jacket," that was too bad for petitioner.

that standard that an actual conflict adversely affected his lawyer's performance.

### E. *Effectiveness of Counsel at the Penalty Trial.*

The issue of ineffective assistance of counsel at the penalty trial is more difficult for us. Counsel's efforts to secure life imprisonment for his client appear perfunctory, and the referee was moved to say during the hearing, "On the guilt phase, it sure sounds like Ames picked the only thing to talk about . . . . [¶] On the penalty phase, it sounds like Ames didn't do much of anything. . . . [¶] Whether the penalty phase should have turned out different, whether it would have made a difference, that is a whole different question. But just from the established point of decency and fairness, one tends to think that when it comes down to somebody's life being at stake, attorneys should at least call some witnesses, make some effort."

We now turn to answer the referee's question. As will appear, we are satisfied that as a matter of constitutional law the claim of ineffective assistance of counsel at the penalty phase must fail for want of prejudice.

We are aided by the superb presentation both parties made at the reference hearing. In essence, the case was retried to the referee after an exhaustive discovery of all possible evidence that favored petitioner, including evidence relating to his background and character (§ 190.3).

As mentioned above, petitioner maintains counsel failed to locate, interview and summon friends and relatives on his behalf. Petitioner argues that had counsel done so, the witnesses could have presented favorable evidence of his background and character—evidence, for instance, of acts of kindness he had performed and of the difficulties his poverty and diabetes created for him in adolescence.

We are unpersuaded that prejudice could have resulted. Respondent's treatment of the parade of friends and relatives who testified at the reference hearing showed the risks of having them testify at trial, for on cross-examination the witnesses were asked devastating questions about the basis for their opinion that petitioner's character was good. Those questions, if asked at trial, would have revealed to the jury specific instances of petitioner's uncharged violent criminal acts, one of which was of a disturbing sexual nature and might well have been heard by the jury even though petitioner was a minor when the incident purportedly occurred. (*People* v. *Raley, supra,* 2 Cal.4th 870, 906-909.) Counsel's investigator learned about the sexual incident in June 1983 while investigating the case before trial and told

counsel about it. There is no reason to believe the prosecution would necessarily have overlooked it. Thus, not only was the referee's conclusion that some of the witnesses would have provided negative as well as positive information correct, but the record also establishes that the cross-examination of the witnesses could have done severe damage to the penalty defense, and that counsel was aware of that risk.[15]

 Nor are we persuaded that if the jury had heard more evidence of the effects of petitioner's drug use or diabetes on his mental state, there is a reasonable probability that the outcome would have differed. As we have explained, petitioner's experts could only surmise that his mental state was abnormal when he committed the murders; there was strong evidence to the contrary.[16]

As already mentioned, petitioner called a psychiatrist, Dr. Rita Hargrave, to give a professional evaluation of his background and character at the reference hearing. In describing petitioner's life, Dr. Hargrave provided layers of complexity and nuance that trial counsel did not elicit in his examination of Dr. Rath. But there was nothing deficient in counsel's presentation of penalty phase evidence via Dr. Rath's testimony—in our view Dr. Rath adequately set forth evidence of petitioner's background and character.

 We are unable to conclude that, if trial counsel had undertaken the exhaustive and laborious efforts his appellate counsel have for the reference hearing, there is a reasonable probability the result would have

---

[15]Counsel also proffered that he had a tactical reason not to produce family members as witnesses: the jury might indignantly or cynically draw a parallel between the victims' families, devastated in the jurors' minds by petitioner's crimes, and petitioner's own family, which was evidently untouched by murder. Counsel testified, "I didn't put on a parade of family members at the penalty phase, because it is my opinion that putting family members on to say 'Save his life,' so to speak, is kind of an affront to the jury. Because I have had jurors say to me, 'What about the family of the victims? Nobody is here to say how about that family. That victim is gone.' And they, the jurors, sometimes take up the cudgel then for the victims' families. And I didn't want that to happen. If I could have kept it professional by putting Dr. Rath on the stand, I thought I might get a fair shake from the jury." (Paragraphing omitted.)

While this explanation, taken in isolation, might lead to a contention that counsel's actions were not deficient, we note that counsel did not undertake the kind of investigation that could have led to an informed tactical decision. (See fn. 12, *ante.*) Therefore we draw no conclusion with regard to quality of performance, and confine our discussion on this point to the question of prejudice.

[16]We note, moreover, the comment of respondent's attorney expert, Raymond Haight of the San Bernardino County District Attorney's office, that San Bernardino County venirepersons are aghast when first asked whether they can consider illicit-drug usage as a factor in mitigation. Haight testified that in his experience only 1 percent of venirepersons are initially prepared to do so.

been different. The jury had evidently accepted the prosecution's theory of the case: that petitioner killed Ora Mae Pope to avenge his punishment for the theft of the Popes' automobile and killed Edward Moreno to silence a witness. There was evidence that petitioner dragged Ms. Pope off to a shed to die and hosed the victims' blood off the pavement. Petitioner thus must have stood, in the jury's eyes, blameworthy for two cold, calculated killings —and the jury was aware of the possibility that petitioner, having lain in wait and with knife at the ready, was preparing to kill Byron Pope. The evidence of the circumstances of the crimes was compelling. As counsel for petitioner stated at the reference hearing with regard to the guilt trial, "Watching the jurors' faces when they were shown the videotaped reenactment, where Mr. Mayfield pulled bodies out of the house and put them into a woodshed and stacked them like cordwood—I had seen that videotape a number of [times] and didn't have to look at it except as to what the jury's reaction to it was. [¶] . . . And my view of the jurors' reaction was not a favorable view to my client."

It is fair to say that before petitioner ever saw a lawyer, he had done much damage to his defense, both with regard to guilt and to penalty. The fact that his lawyer's efforts at the penalty phase were somewhat perfunctory disturbs us, but we discern no reasonable probability that additional evidence of background, character, or mental impairment—subject as the first two would have been to potentially devastating cross-examination and the third to the forceful contrary evidence the tapes provided—would have affected the outcome.

## CONCLUSION

One multiple-murder special-circumstance finding is vacated. The judgment otherwise is affirmed entirely and the petition for writ of habeas corpus is denied.

Lucas, C. J., Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I join in the majority opinion affirming defendant's conviction of two counts of first degree murder, and upholding the jury's finding of the multiple-murder special circumstance. But because of trial counsel's constitutionally inadequate representation of defendant at the penalty phase of this capital case, I do not join in the majority's denial of defendant's petition for writ of habeas corpus, insofar as that petition challenges the adequacy of trial counsel's performance at the penalty phase.

The record of the thorough evidentiary hearing, ably conducted by a superior court judge sitting as this court's habeas corpus referee, demonstrates a total failure by trial counsel to adequately investigate, prepare, and

present defendant's case at the penalty phase. Incredibly, in this capital case, counsel spent a total of only 40 hours preparing for both the guilt and penalty phases of the trial. Counsel's trial file contained no notes or legal research, and his only substantive interview with defendant took place at the courthouse on the morning of the start of trial. With respect to the penalty phase, counsel conducted virtually no investigation, and he made no effort to present mitigating evidence through witnesses whom he could have called. As the referee dryly commented at the evidentiary hearing, "when it comes down to somebody's life being at stake, attorneys should at least call some witnesses, make some effort." Had counsel done so, the jury would have heard from defendant's many family members who were prepared to testify about his character and background, and the jury would have heard from experts who could have explained that, at the time of the crimes, defendant's insulin-dependent diabetes and use of phencyclidine (PCP) may have significantly affected his behavior. Counsel's failure to present this evidence undermines confidence in the judgment of death, requiring that the death sentence be reversed and a new penalty trial conducted.

## I.

On the morning of February 3, 1983, defendant, who was then 21 years old, left the house of his friend, Patricia Harper, and entered a nearby residence, where he shot and killed Ora Mae Pope and Edward Moreno. Defendant was charged with capital murder. At the guilt phase of the trial, defense counsel's entire presentation on defendant's behalf consisted of playing the audio tape-recording of defendant's statements to the police and making a closing argument.[1] Similarly minimal were counsel's efforts at the penalty phase. There he made no opening statement, called only one defense witness, and made a perfunctory closing argument (taking up six pages of the trial transcript). The jury returned a verdict of death.

While his appeal in the capital case was pending, defendant petitioned this court for a writ of habeas corpus. We issued an order to show cause, appointed a referee, and directed the referee to make findings regarding defendant's claim that he was denied effective assistance of counsel at trial.

At the habeas corpus reference hearing, defendant presented substantial evidence that trial counsel's investigation, preparation, and presentation for

---

[1]Although counsel's representation of defendant throughout the trial was inadequate, I agree with the majority that the inadequacy was harmless at the guilt phase. Nevertheless, I have set forth some facts relating to counsel's inadequate efforts at the guilt phase to demonstrate that counsel's representation was inadequate throughout defendant's trial, not merely at the penalty phase, and to show that this is not a case in which counsel's failure to present mitigating evidence at the penalty phase of trial was offset by the introduction of such evidence at the guilt phase. (See, e.g., *In re Fields* (1990) 51 Cal.3d 1063, 1080 [275 Cal.Rptr. 384, 800 P.2d 862].)

the penalty phase of trial were grossly inadequate. Despite the availability of numerous family members who at the penalty phase could have offered mitigating evidence relating to defendant's background and character that the jury may well have found persuasive, counsel failed to call even one such witness. Five of these witnesses testified at the reference hearing. Here, in summary, is what they said.

Teresa Mayfield, defendant's cousin, testified that defendant was not a violent person, that he took care of and was very kind to her children, significantly helping one of them to overcome a speech problem, and that the two murders were out of character for him.

Tricia Mayfield, defendant's younger sister, also testified that the crimes were out of character for defendant. She described defendant as a kind and gentle person who had been protective of her as a child.

Calvin Hawkins, one of defendant's uncles, stated that when he was disabled and in a wheelchair following a motorcycle accident, defendant was kind to him, provided him transportation, and took care of him for an extended period of time.

Cicero Mayfield, defendant's younger brother, testified that defendant had helped him by teaching him how to avoid drugs and gangs. He was shocked when he learned of defendant's arrest because the charges were inconsistent with defendant's character and personality.

Hazel Hawkins, defendant's mother, traced defendant's problems to diabetes, which he developed at the age of nine. She stated that she had wanted to testify at trial to ask the jury to spare her son's life.

In addition to these witnesses, the habeas corpus referee found that Willie Willingham, one of defendant's uncles, who was deceased at the time of the reference hearing, would have testified to defendant's disadvantaged childhood and given his view that defendant could overcome his personal and drug-related problems.

The record of the reference hearing further shows the availability of medical evidence relating to defendant's insulin-dependent diabetic condition and his ingestion of PCP, and their possible effect on his behavior at the time of the crimes. Defendant's trial counsel, however, never considered this mitigating evidence and consequently the jury never heard it. A summary of the testimony of these experts follows.

Dr. Clinton Young, an endocrinologist, stated that a diabetic with a blood-sugar level over 300 may experience blurred vision, impaired reasoning, dehydration and headaches, and that a blood-sugar level of 371 (defendant's level following his arrest) may additionally produce fatigue and nausea. Dr. Young also mentioned defendant's health problems, such as his refusal to eat properly, his refusal to take his insulin shots, and his numerous hospitalizations for poorly controlled diabetes, including a hospitalization one month before the killings.

Dr. David Smith, a toxicologist, testified that PCP "flashbacks" are common in a person who, like defendant, is diabetic. He explained that PCP is stored in the body's fatty tissues and discharged later, causing a psychotic reaction, and that the acidification of blood and urine that occurs when a diabetic loses control may increase the amount of this discharge. Dr. Smith concluded that both the ratio of acidosis obtained from defendant when he was arrested (just hours after he committed the murders), and an acidification reading obtained from him four days later, were sufficiently high that PCP could have been released from defendant's fatty tissues when he committed the murders. In Dr. Smith's opinion, a combination of PCP abuse, alcohol abuse, out-of-control diabetes, and depression may have impaired defendant's reasoning process and impulse control at the time of the crimes.

Dr. Rita Hargrave, a psychiatrist, related information regarding defendant's childhood. In her view, defendant's mental disorders, together with his diabetes and use of PCP, influenced his actions at the time of the crimes.

Dr. Guy Hunt, a neurologist, testified that killings were out of character for defendant and were the result of definite cerebral impairment. He added that the negative results of the computerized axial tomography (CAT) scan and electroencephalogram he had performed on defendant did not change his opinion.

The strength of the mitigating evidence relating to defendant's background and character and his medical condition was such that, had it been presented, the jury may well have found it to extenuate the gravity of the crimes. Despite its availability, however, defendant's trial counsel did not offer the evidence at the penalty phase. During the entire trial, counsel called only one witness on defendant's behalf.

That sole defense witness was Dr. Craig Rath, a clinical psychologist, who testified at the penalty phase. On direct examination by defense counsel, Dr. Rath expressed his opinion that the two murders were "out of character" for defendant. He described defendant's long history of diabetes, which included

20 to 30 hospitalizations. Dr. Rath also testified to defendant's remorse and to a report that had been prepared for defense counsel by Dr. Guy Hunt, a neurologist. From that report, Dr. Rath quoted Dr. Hunt's conclusion that "the crime of which [defendant] is accused is out of character and can be explained only on the basis of definite cerebral impairment due to alcohol and drug abuse."

In its cross-examination of Dr. Rath, the prosecution reviewed a number of psychological tests Dr. Rath had administered, highlighting that many of defendant's specific responses on the tests contradicted the defense position. Dr. Rath acknowledged that two tests referred to in Dr. Hunt's report, an electroencephalogram and a CAT scan, did not show any irregularities in the brain.

After conducting its redirect examination of Dr. Rath, the defense rested. The prosecution then called Dr. Soltz, a psychologist, as a rebuttal witness. Dr. Soltz was of the opinion that defendant's mental condition was not abnormal, that he did not express remorse, and that he intended to kill when he committed the crimes.

As I have just shown, there is a substantial disparity between the strong mitigating evidence presented by the defendant's appellate counsel at the reference hearing and the evidence that the defendant's trial attorney actually presented to the jury at the penalty phase of defendant's capital trial. Although this mitigating evidence was available to trial counsel, he called only one witness at the penalty phase, and that witness's testimony was virtually nullified by the prosecution's cross-examination and its rebuttal witness. As I shall discuss, trial counsel's failure to present the mitigating evidence in question deprived defendant of his constitutional right to effective representation at the penalty phase of his capital trial.

## II.

Under both the federal and state Constitutions, a criminal defendant is entitled to the effective assistance of counsel, that is, to counsel whose performance meets or exceeds an objective standard of reasonableness under prevailing professional norms. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052]; *People* v. *Mincey* (1992) 2 Cal.4th 408, 449 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Effective representation requires that counsel adequately investigate, prepare, and present the defense. (*In re Fields*, *supra*, 51 Cal.3d at p. 1069; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) It is particularly important in capital cases, which are often factually and legally

complex, that courts ensure protection of the defendant's constitutional right to a full defense. (*Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 430-431 [180 Cal.Rptr. 489, 640 P.2d 108].) Of course, the presentation of a full defense by competent counsel requires that the defense attorney focus the defense efforts on the issues to be determined by the trier of fact.

At the penalty phase of a capital trial, the jury is literally deciding a matter of life or death. "In explaining the jury's role at the penalty phase, we have stated that the jury exercises an essentially normative task, acting as the community's representative, that it may apply its own moral standards to the aggravating and mitigating evidence presented, and that it has ultimate responsibility for determining if death is the appropriate penalty for the particular offense and offender." (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1037 [254 Cal.Rptr. 586, 766 P.2d 1]; accord, *People* v. *Karis* (1988) 46 Cal.3d 612, 639 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Williams* (1988) 44 Cal.3d 883, 960 [245 Cal.Rptr. 336, 751 P.2d 395].) In carrying out this task, the jury must consider not only the nature of the offense, but also the background and character of the defendant (*Penry* v. *Lynaugh* (1989) 492 U.S. 302, 318-319 [106 L.Ed.2d 256, 277-278, 109 S.Ct. 2934]; *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6-7, 106 S.Ct. 1669]), and any other circumstance that extenuates the gravity of the crime even though it is not a legal excuse for the crime. (Pen. Code, § 190.3, factor (k); *People* v. *Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440].) Here, trial counsel's representation of defendant at the penalty phase was woefully inadequate.

As the habeas corpus referee commented in his report to this court, "[i]t is apparent . . . that [trial counsel] never gave much thought to a penalty phase." The record of the reference hearing shows serious deficiencies in defense counsel's investigation, preparation, and presentation of the defense at the penalty phase of defendant's capital trial.

Defendant's trial counsel either never interviewed, or only superficially interviewed, witnesses who could have offered strong mitigating evidence based on defendant's background and character. As I set forth earlier, trial counsel never interviewed Teresa Mayfield (defendant's cousin), Tricia Mayfield (defendant's sister), or Calvin Hawkins (defendant's uncle). The defense investigator's interview of defendant's brother, Cicero Mayfield, was so brief that it may fairly be characterized as nonexistent. With respect to Hazel Hawkins, defendant's mother, the defense investigator's interview focused on information adverse to defendant; the investigator never inquired into aspects of defendant's background or character favorable to defendant.

The one significant interview trial counsel had with defendant occurred at the courthouse on the morning of the start of trial in this capital case.

Counsel had, as the referee stated, "very superficial conversations at the courthouse" with defendant's mother, Hazel Hawkins; with his uncle, Willie Willingham; and with Patricia Harper, whom the referee characterized as a key prosecution witness and who was also a friend of defendant's and sympathetic to him. Trial counsel sought production of only a few of defendant's medical records. He did not retain appropriate medical experts, such as an endocrinologist, toxicologist, or psychiatrist, who in this case could have provided testimony highly favorable to the defense.

Similarly insufficient was trial counsel's preparation of the defense. As established at the habeas corpus hearing, counsel spent no more than 40 hours in out-of-court preparation on both the guilt and the penalty phases of this capital case. His trial file, from which nothing had been removed, contained no notes or legal research. He never listened to a tape-recorded statement prepared for him by Patricia Harper, who, as I explained above, was a key prosecution witness and also a friend of defendant's and sympathetic to him. As the referee found, the "preparation was clearly inadequate."

Trial counsel's presentation of the defense case at the penalty phase of trial was likewise seriously lacking. Trial counsel stipulated at trial that the prosecution's test results of a urine sample taken from defendant upon his arrest did not indicate the presence of any drugs. The urine sample was, however, never analyzed, although, as the referee found, a urine test is considered the most reliable indicator for PCP. Also, trial counsel did not call Dr. Guy Hunt, a neurologist, as a witness at the penalty phase. Dr. Hunt had performed a number of neurological tests on defendant and had prepared a report. The report states Dr. Hunt's conclusion that "the crime of which [defendant] is accused is out of character and can be explained only on the basis of definite cerebral impairment due to alcohol and drug abuse." Thus, Dr. Hunt could have assisted the defense in persuading the jury that defendant's worth as an individual should not be judged solely by his commission of the capital murders, shocking as they were, because the murders occurred while defendant was in an abnormal state.

At the habeas corpus reference hearing, trial counsel was unable to present a viable excuse for his failure to adequately investigate, prepare, or present the defense case; his attempts to offer an explanation were simply not credible. For example, he said he did not call Dr. Hunt, the neurologist, as a witness at defendant's capital trial because Dr. Hunt had told counsel his testimony would have a "devastating" effect on defendant's case. Counsel stated he did not ask Dr. Hunt about the nature of the "devastating" information. Dr. Hunt, however, denied making the statement in question, and the referee found counsel's story implausible. The referee concluded

that Dr. Hunt did not possess any "devastating" information pertaining to defendant, and that Dr. Hunt had put all of the material information he had in his report to defendant's trial counsel. On this issue, the referee stated, "[t]his court simply cannot imagine an attorney defending a capital case and blinding himself to 'devastating' information." With respect to counsel's failure to call Willie Willingham, one of defendant's uncles, as a witness at trial, counsel stated at the reference hearing that he thought Willingham had a felony record. In fact, Willingham did not have a felony record.

Counsel's minimal presentation at the penalty phase of defendant's capital trial cannot be justified as a tactical decision. An informed and rational decision based on strategy and tactics can be made only after adequate investigation and preparation. (See, e.g., *In re Fields, supra,* 51 Cal.3d at p. 1069; *People* v. *Ledesma, supra,* 43 Cal.3d at p. 215.) Here, because his investigation and preparation were seriously inadequate, counsel was unaware of much of the potentially mitigating evidence that existed. Therefore, it cannot be said that counsel's failure to present that evidence was an informed tactical choice.

Counsel's grossly inadequate performance at the penalty phase denied defendant his constitutional right to effective representation. The prosecution's legal expert, a prosecutor who knew defendant's trial counsel, succinctly described trial counsel as "the type of attorney who seeks to win his cases by inspiration, not perspiration; by oration, not preparation." In this case, counsel's inspiration and oration were not enough. As I shall discuss, trial counsel's failings were prejudicial. The mitigating evidence that a competent attorney would have presented was significant enough, in the context of other evidence bearing on penalty, that confidence in the outcome—the verdict of death—is substantially undermined.

### III.

To obtain relief on the basis of ineffective assistance of counsel at the penalty phase, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 693 [80 L.Ed.2d at p. 697].) Instead, the defendant is entitled to a reversal of the penalty phase if the ineffective assistance of counsel "undermine[s] confidence" in the verdict of death. (*Id.* at p. 694 [80 L.Ed.2d at p. 698]; *In re Fields, supra,* 51 Cal.3d at pp. 1078-1079.)

Here, as I discussed in detail earlier, trial counsel's investigation, preparation and presentation at the penalty phase were so grossly inadequate as to

undermine any reasonable confidence in the verdict of death. Counsel's inadequacies precluded the jury from ever learning of substantial mitigating evidence of defendant's background and character, and medical condition. The majority nevertheless concludes that it "need not give weight to deficiency [of trial counsel] when we conclude that there was no prejudice." (Maj. opn., *ante*, at p. 200.) The majority asserts that trial counsel's performance was not prejudicial because at the habeas corpus reference hearing the defense witnesses were asked "devastating questions" on cross-examination that if asked at trial "would have revealed to the jury specific instances of [defendant's] uncharged violent criminal acts . . . ." (Maj. opn., *ante*, at p. 207.) Not so.

The testimony at the habeas corpus reference hearing does not support the majority's assertion. As the referee found, "[m]any of the uninterviewed lay witnesses did not have negative information regarding [defendant]." This finding is confirmed by a review of the prosecution's cross-examination of a number of the witnesses at the reference hearing.

At that hearing, a major point that the prosecution sought to make in its cross-examination of defendant's relatives—Teresa Mayfield, Tricia Mayfield, Calvin Hawkins, Cicero Mayfield, and Hazel Hawkins—was that these witnesses did not more affirmatively seek out defendant's trial counsel or inject themselves into the defense of the case. Unlike the majority, I do not find this cross-examination "devastating"; it is legally meaningless. It is the *attorney* who has the obligation to investigate and prepare. (*In re Fields, supra,* 51 Cal.3d at p. 1069.) The law does not require potential witnesses to seek out trial counsel, marshall the pertinent facts for counsel, or otherwise develop the defense.

To support its assertion that defendant's trial counsel's ineffective representation at the penalty phase was not prejudicial because of the prosecution's "devastating" cross-examination of the defense witnesses at the habeas corpus reference hearing, the majority refers to evidence of a single incident of "a disturbing sexual nature." (Maj. opn., *ante,* at p. 207.) The majority's implication of prior serious sexual misconduct by defendant that would have driven the jury to impose the death penalty overstates both the facts and the potential impact this incident may have had on the jury.

The incident occurred when defendant was 11 years old, 10 years before the commission of the crimes in this case. It was based on defendant's mother finding him with his pants down on top of his two-year-old sister with her dress pulled up. The sister, who was examined by defendant's mother both immediately after the incident and the next morning, showed no

outward signs of sexual molestation. Defendant told his mother at the time that he did what he did because two other eleven-year-old children in the neighborhood had suggested he do so.

This particular evidence has minimal probative value in the decision whether to sentence defendant to death for the two murders he committed. Defendant was a young child at the time; the incident happened 10 years before the crimes in this case. And, contrary to the majority's assertion, the incident, although disturbing, is not "devastating," as the following excerpt from the prosecution's cross-examination of Tricia Mayfield indicates. "[Question] You think it is normal for, say, a 10-year-old to try to have sex with a three-year-old? [¶] [Answer] I don't think it is normal, but I don't think it is abnormal either. [¶] [Question] Is that something you heard happened among family members? [¶] [Answer] That's not unfamiliar to any race in any part of the nation. [¶] [Question] So you think that is a perfectly normal thing to have happened? [¶] [Answer] I think perfectly normal to have a 10-year-old to wonder about sex with a sister or friend or whatever. [¶] [Question] The question is do you think it is normal for a 10-year-old to try to have sex with his sister? [¶] [Answer] Not normal. But like I said, [it is] not abnormal either."

Given the minimal probative value of this childhood incident, it is doubtful it would have had much, if any, impact on the jury. For the same reason, it is doubtful that, had defendant's trial counsel considered the matter,[2] the evidence would have been presented to the jury. The minimal probative value of the evidence provides an ample basis for it to have been excluded at trial. (Evid. Code, § 352.) Indeed, it is questionable whether the prosecutor would have even tried to introduce such evidence. As the just-quoted cross-examination of Tricia Mayfield at the habeas corpus reference hearing demonstrates, introduction of this evidence by the prosecution was not without its tactical risks. For the reasons I have articulated, I find the majority's reliance on this childhood incident to be seriously misplaced.

Equally wrong is the majority's assertion that the defense experts who testified at the habeas corpus reference hearing were subject to "devastating" cross-examination by the prosecution. A review of the cross-examination of Drs. Hunt, Young, Smith, and Hargrave at the reference hearing does not support this assertion. To the extent the majority means to refer to expert testimony that a person in defendant's situation could form the intent to kill

---

[2]It appears from trial counsel's testimony at the reference hearing that he believed the incident to have occurred closer in time to defendant's commission of the offenses in this case. Had counsel investigated, he would have learned that the incident took place when defendant was a young boy 10 years earlier.

and premeditate murder, the majority confuses the issues at the guilt phase with the much broader issues at the penalty phase. Under California's capital punishment law, the issues at the penalty phase include defendant's character and background and any other consideration that tends to extenuate the gravity of the offense. (§ 190.3, factor (k).) The testimony of defendant's expert endocrinologist, neurologist and psychiatrist spoke directly to matters the jury should have considered—whether his long-term diabetes, substance abuse and psychiatric problems made defendant less deserving of society's ultimate penalty, and a better candidate for the penalty of life in prison.

## IV.

The choice between life and death at the penalty phase of a capital case is the most serious decision a jury can be asked to make. "The United States Supreme Court has expressly recognized that death is a different kind of punishment from any other, both in terms of severity and finality. Because life is at stake, courts must be particularly sensitive to insure that every safeguard designed to guarantee defendant a full defense be observed. (*Gardner* v. *Florida* (1977) 430 U.S. 349, 357 [51 L.Ed.2d 393, 401-402, 97 S.Ct. 1197][.])" (*Kennan* v. *Superior Court, supra*, 31 Cal.3d at p. 430.) Here, the strength of the evidence adduced at the habeas corpus reference hearing, when compared to the evidence presented at the penalty phase and the depth of the inadequacies of defendant's trial counsel, thoroughly undermine any reasonable confidence in the verdict of death. Had trial counsel adequately presented the defense at the penalty phase, it cannot be concluded that the result—a verdict of death—would have been the same. In such circumstances, we must put aside any personal beliefs as to the propriety of the penalty of death, and allow the jury to make its own decision based on all the evidence, presented by competent counsel.

I would issue the writ of habeas corpus, vacate the sentence of death, and direct a retrial of the penalty phase.

Appellant's petition for a rehearing was denied July 21, 1993, and the opinion was modified to read as printed above. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.